```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEBRASKA
 2

 3   UNITED STATES OF AMERICA,    )   Case No. 4:23CR3019
                                  )
 4             Plaintiff,         )
                                  )
 5   vs.                          )
                                  )
 6   ANTHONY UNOCIC,              )
                                  )   Lincoln, Nebraska
 7             Defendant.         )   September 25, 2023

 8

 9                          VOLUME I
                    TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE JOHN M. GERRARD
             SENIOR UNITED STATES DISTRICT JUDGE
11

12                   A-P-P-E-A-R-A-N-C-E-S

13   FOR THE PLAINTIFF:        Mr. Daniel D. Packard
                               Ms. Danielle Fliam
14                             U.S. Attorney's Office
                               100 Centennial Mall North
15                             Suite 487
                               Lincoln, NE 68508-3865
16
     FOR THE DEFENDANT:        Mr. Korey L. Reiman
17                             Federal Public Defender's Office
                               100 Centennial Mall North
18                             112 Federal Building
                               Lincoln, NE 68508
19

20

21   COURT REPORTER:          Ms. Lisa Grimminger, RDR, CRR, CRC
                               100 Centennial Mall North
22                             Room 587
                               Lincoln, NE 68508
23                             (402) 437-1908

24

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer.
```

1          (At 9:19 a.m. on September 25, 2023; with counsel for the

2    parties and the defendant present; WITHOUT the prospective jury

3    panel:)

4          THE COURT:  Good morning, everyone.  This is day one

5    of trial, United States of America versus Anthony Unocic.  This

6    is Case Number 4:23CR3019.  Comes on now -- we're outside of

7    the presence of the prospective panel.

8      Counsel, I want to take up a few -- first of all, let's

9    enter your appearance, and then we'll take up a few matters

10   before we bring the jury in.

11         MR. PACKARD:  Dan Packard and Danielle Fliam from the

12   U.S. Attorney's Office, and James Burkett, B-U-R-K-E-T-T,

13   special agent for the ATF.  He will be our case agent.

14         THE COURT:  I'm sorry.  Give that to me again.

15   James -- spell his last name.

16         MR. PACKARD:  Burkett, B-U-R-K-E-T-T.

17         THE COURT:  All right.  Very well.  Very good.  Thank

18   you.  Welcome.

19      All right.  I'll hear from the defense.

20         MR. REIMAN:  Korey Reiman with Mr. Unocic, and Aimee

21   Baade, our office assistant, is sitting at counsel table as

22   well.

23         THE COURT:  Aimee, are you going to be here

24   throughout the trial?

25         MS. BAADE:  Yes.

1          THE COURT:  Very well.  A couple of matters to take

2     up beforehand.  The Court wants to determine whether a *Missouri*

3     *vs. Frye* hearing is necessary.  It's the Court's understanding

4     there's not been a plea agreement that's been extended to the

5     defendant.  Is that correct?

6          MR. PACKARD:  That's right.  The parties informally

7     discussed resolution without trial, but there was never any

8     kind of formal offer or plea offer made to the defense.  Thank

9     you.

10         THE COURT:  All right.  Very well.  And is that your

11    understanding also, Mr. Reiman?

12         MR. REIMAN:  Yes, that's correct.

13         THE COURT:  Okay.  So there was nothing to accept or

14    reject one way or the other.

15         MR. REIMAN:  Correct.

16         THE COURT:  All right.  Very well.  And on Friday I

17    think we were already on the record.  There was a motion, a

18    joint motion to sequester witnesses which the Court has

19    sustained.  So other than Special Agent Burkett, who's -- who

20    will be in the courtroom, the government will need to sequester

21    witnesses.  And you understand that?

22         MR. PACKARD:  Yes, Your Honor.

23         THE COURT:  Okay.  And, Mr. Reiman, that's your

24    understanding also?

25         MR. REIMAN:  I should have brought this up

1    previously.  Tawnya Root from our office is our --

2         THE COURT:  I'm going to have you pull the microphone

3    just a little closer.

4        Thank you.

5         MR. REIMAN:  Tawnya Root from our office is our

6    investigator.  Of course I don't know what's going to come out,

7    and maybe there's a 1 percent chance I may need to call her as

8    a rebuttal witness.  I have no plans for that, but like I said,

9    you never know what's going to happen.  I don't believe Tawnya

10   is planning on sitting in on the trial; however, I think she

11   would like to come up and watch parts of it.  I would ask for

12   the Court to exclude her from the sequestration order.

13       If that's not an option, at the very least -- she's never

14   seen jury selection before, and at the very least, if we could

15   allow her to watch jury selection, because she is planning on

16   helping at the next trial and it would benefit both our office

17   and Tawnya greatly if she could at least watch that.

18        THE COURT:  Certainly during jury selection the Court

19   has no issue with that.  What's the government's position?

20        MR. PACKARD:  No objection to jury selection.

21   Government would object to her watching witness testimony

22   unless there's a reason advanced as to why there should be an

23   exception.

24        THE COURT:  All right.  Yeah.  So the motion to

25   sequester will be for any witnesses either that will be called

1    or will potentially be called, but she may attend as far as

2    jury selection this morning.

3         All right.  As far as jurors, I met informally to do my

4    jury orientation.  I wanted to let you know there was one

5    juror, Juror Number 6 -- under our court rules, if somebody is

6    over age 70 and wishes not to serve, they may be excused, but

7    they're not automatically excused.  She is from Aurora, I

8    believe.  It's Glenda.  You've got her last name?

9         All right.  Juror Number 6, she prefers not to serve.  I'm

10    not going to excuse her right away, but what I would propose to

11    do is have -- so you do not have to waste a peremptory strike

12    on her, I would propose that she become an alternate, that she

13    become Juror Number 36.  In other words, if we're running out

14    of jurors, I may not be excusing her.  But does anybody have

15    any objection to that?

16         MR. PACKARD:  No, Your Honor.

17         THE COURT:  So, Kathy, if you would, let -- Juror

18    Number 32 then will move up to Juror Number 6.  Okay?  So she

19    will still be in the pool, but she's going to be Number -- she

20    would be the last potential alternate if we needed her.  Does

21    that meet with both of your approval?

22         MR. PACKARD:  Can you tell me who Number 6 will be

23    now, Judge, or do we know that yet?

24         THE COURT:  Yes.  Do you have that, Kathy?  If you

25    can give counsel....

1          COURTROOM DEPUTY:  It's Brandon.  He's currently
2     Number 32.
3          MR. PACKARD:  Thank you.
4          THE COURT:  Do you have it, Korey?
5          MR. REIMAN:  Yeah.  So when I'm looking at this, this
6     doesn't have 32 on it.  So what's my disconnect?
7          COURTROOM DEPUTY:  The judge's list.
8          MR. REIMAN:  Okay.  Thanks.
9          THE COURT:  Okay.  So Number 32 there will be --
10         MR. REIMAN:  What was the name again?
11         COURTROOM DEPUTY:  Brandon.
12         THE COURT:  Number 32.
13         MR. REIMAN:  Okay.  Thank you.  We got it.
14         THE COURT:  Okay.  I want to make sure you're able to
15    get in place so you know.  I want to do the same thing.
16         All right.  Is there anything else we need to take up
17    before we bring the jury?
18         Yes, Mr. Reiman.
19         MR. REIMAN:  I might have missed this.  If I did, I
20    apologize.  Are we not using surnames?
21         THE COURT:  We're not in a case of this nature.  You
22    can use their first name and juror number.
23         MR. REIMAN:  Okay.  Thank you.
24         THE COURT:  Thank you.
25         MR. REIMAN:  And are the jurors aware of that?

1          THE COURT:  Yes.  Now, every once in a while they'll

2    introduce themselves.  If they do, they do, but I have told the

3    jurors that they will use their first name and juror number and

4    that's it.  But if they say what their name is, then they do.

5        All right.  Anything else from the government?

6              MR. PACKARD:  No, Your Honor.

7              THE COURT:  Or from you, Mr. Reiman?

8              MR. REIMAN:  No, sir.

9              THE COURT:  All right.  Very well.  Let's take a few

10   minutes.

11       And, Kathy, you may have to make the switch.

12       Okay.  So we will be in recess for about five minutes or

13   so, and we'll commence voir dire right then.

14       (Discussion off the record.)

15             THE COURT:  Counsel, I don't know what her name --

16   did we find out what her name was, the juror that -- there is

17   a -- one of the questions I will be asking or you may be

18   asking:  Is there any reason that you cannot serve either

19   philosophically or personally or don't want to judge?  There is

20   a female that is a minister that said she was not comfortable

21   in a criminal case.  I explained to her what the situation --

22   and I will explain to her again in voir dire, and I said the

23   lawyers will explore that further.  But I just want you to know

24   that there's a minister there that's -- I'm not going to excuse

25   her based on that, but we'll -- we will know who that is when I

1    ask.  Okay.  Thank you.

2         (Recess taken at 9:28 a.m.)

3         (At 9:35 a.m. on September 25, 2023; with counsel for the

4    parties and the defendant present; WITHOUT the prospective jury

5    panel:)

6              THE COURT:  We're outside of the presence.  Is there

7    anything we need to take up before we bring the jury?

8              MR. REIMAN:  I have a dumb question.  I should have

9    brought -- I apologize I didn't bring this up sooner.  So we

10   got 31 here; right?

11             THE COURT:  Yes.

12             MR. REIMAN:  Okay.  So 6, 12, and 12.  Am I following

13   this right?

14             THE COURT:  Yes.

15             MR. REIMAN:  So what's the 31?

16             THE COURT:  Well, we're going to have -- defense gets

17   ten strikes.  Government gets six.  That's 16, and then we have

18   one alternate.

19             MR. REIMAN:  Will the alternates be the last three,

20   and we'll each strike one?

21             THE COURT:  You each get a strike.  You'll each get

22   to strike an alternate out of any of them.  Okay?  You'll each

23   get a strike on an alternate.

24             MR. REIMAN:  I understand.

25             THE COURT:  Whoever's left, and there's 13 left.

 1          MR. REIMAN:  Okay.  I understand.  I do.  Yeah.

 2          MR. PACKARD:  So the government will pick its six

 3     strikes, and then the next -- seventh strike will be the

 4     alternate that we're picking for?

 5          THE COURT:  Yeah.  And Kathy will go back and forth

 6     with you, but it's ten and six, and you each get one alternate

 7     strike.

 8          MR. REIMAN:  It's going to go one, two, one, two,

 9     until I run out of two?

10          THE COURT:  And Kathy will be right there with you

11     and walk you through it.

12          MR. REIMAN:  Thank you.

13          THE COURT:  Okay.  No dumb questions.  That's all

14     right.  Okay.  Good.

15       All right.  Are we ready to bring the jury?

16          MR. PACKARD:  Yes, Your Honor.

17          THE COURT:  Okay.  All right.  Let's bring the jury.

18       (Jury selected and seated.)

19          THE COURT:  All right.  Now that you've all been

20     seated, I need to have you stand one more time.  We're going to

21     take one final oath, if you would.  If you'd please raise your

22     right hand.

23       (Jurors sworn.)

24          THE COURT:  All right.  Very well.  You may be

25     seated.  I want to give you an instruction before we break, and

1    I want to tell you just -- you'll have an opportunity to call
2    either employers or loved ones to tell them where you will be
3    over the course of the next three or three and a half days.
4    Just for your scheduling purposes, we will start at 8:45 every
5    morning, so I'll ask you to be here between 8:30 and -- 8:35
6    and 8:40, and we will get started at 8:45 each day, and we'll
7    end at 4:30 each day.  We will have a one-hour break at noon.
8    There's always a 15-minute break in the morning and the
9    afternoon.  Just so you know what your scheduling is, we start
10   at 8:45.  We end at 4:30 each day.
11       We're about to start our first break at trial.  Even
12   though you've heard very little about the actual facts of the
13   case -- actually, you've heard what the case might be about.
14   You've heard no facts yet 'cause nobody's been placed under
15   oath.  I want to remind you of a few things that are especially
16   important, and they'll remain important throughout the trial.
17   Until this trial is completed, you're not to discuss this case
18   with anyone, whether members of your family, people involved
19   with the case, or anyone else, and that includes your fellow
20   jurors, until it's time for you to deliberate.
21       Nor should you post anything on the Internet about this
22   case until the case is over, so you shouldn't go onto Google,
23   Google any witnesses, parties, judges, lawyers.  You shouldn't
24   go onto Instagram, TikTok, or any other -- don't tweet that
25   you're a juror in this case, you know, and I say that, and

1    everybody shakes their head.  I had a case about two years ago.

2    I hadn't -- my words weren't even out of the mouth, and the

3    jurors had left, and somebody was already tweeting as soon as

4    they left the courtroom, and we had to call them back in and

5    regive the instruction, et cetera.  So when I say you're not to

6    discuss this case with anyone including each other, we mean

7    that.

8        If anyone approaches you during the course of the trial

9    and tries to discuss the trial with you, please let me know

10   about it immediately.  That's why you're wearing that juror

11   badge.  Also you must not read or listen to any news reports

12   about the trial.  Sometimes there are and sometimes there are

13   not, but regardless, you're not to read anything about the

14   trial while it's going on.  And you should not do any research

15   or make any investigation about the case on your own.  You're

16   going to hear certain terms, et cetera, during the course of

17   the trial.  You're not to Google anything or do any of your own

18   research.  This case should be decided by the evidence and the

19   instructions that I give you and by nothing else.

20       Finally, remember that you must not talk about anything

21   with any of the parties or the lawyers or the witnesses who are

22   involved in this trial even if it has nothing to do with the

23   trial.  That's why when Mr. Reiman said oftentimes you'll see

24   him in the hallway, et cetera, and they're not looking at you,

25   there's a reason for that.  Okay?  You're not to discuss

1    anything, including the weather, with anyone during the course

2    of the trial.

3        Let's see.  I've given you the instruction on not to

4    Google the names.  So if you need to speak to me about anything

5    during the course of the trial, just give a note to Ms. Miller,

6    my courtroom deputy, and she'll get that to me.  Now, I'm not

7    going to repeat all of these things to you before every break

8    that we take, but these instructions remain important.  Keep

9    them in mind during the course of the trial.

10        So we're going to take about a one-hour-and-five-minute

11    break at this point in time so you can get lunch, place your

12    calls that you need to.  So if you'll be back here at 1:35, we

13    will start.  I will give you your preliminary jury instructions

14    and opening statements.  We'll commence at 1:40.  I'll ask you

15    to be back here at 1:35, and we'll start at 1:40.

16        All right.  We will stand adjourned until then.

17        (Jury out at 12:35 p.m.)

18        THE COURT:  You may be seated.  Counsel, is there

19    anything that we need to take up before we break?

20        From the government.

21        MR. PACKARD:  Judge, I would move to have the

22    defendant wear a leg brace during the course of the trial based

23    on the nature of the allegation and the evidence before the

24    Court during pretrial motions.  Thank you.

25        THE COURT:  Very well.  Any objection to that?  I

 1    mean, that's the normal course of business.  I'm not sure --

 2          MR. REIMAN:  Well, and I'm not complaining about it,

 3    but I don't like the United States Marshal standing, hovering.

 4    I mean, that looks worse than anything.  So I understand.  I

 5    don't want to get in the way of your job, but I also don't want

 6    the United States Marshal standing right by my client the

 7    entire time.  So if those leg irons will help alleviate any

 8    concerns you guys have, I will not object.

 9          THE COURT:  All right.  Very well.  Both of those

10    motions will be granted.  I didn't notice.  Was the marshal --

11          MR. REIMAN:  I didn't notice.  Just this last part,

12    and I think maybe you were -- just needed to stand up.  I'm

13    with you.

14          THE COURT:  Okay.  And I don't think the marshal will

15    be doing anything with that, so both motions will be granted.

16    I will say this.  As far as any leg bracings, that would be

17    normal course in this type of case, but I want to make sure

18    that Mr. Unocic is in before the jury comes in and that he

19    leaves before -- or I mean that the jury leaves before he's

20    taken out.  There should be nobody knowing that there are any

21    leg braces that are on.  Okay?  All right.  So both of those

22    motions will be sustained.

23          Anything else we need to take up from the government?

24          MR. PACKARD:  No, Your Honor.

25          THE COURT:  Or from you, Mr. Reiman?

1           MR. REIMAN:  You want us at 1:35 also?

2           THE COURT:  Yeah.  If you would be back here --

3   basically, if you'll be back here at 1:30 if there's anything

4   to take up.  I want to -- I mean I want to get started right at

5   1:40, so if there's anything to take up, I need to know, and we

6   need to be in here at 1:30.

7           MR. REIMAN:  Can we leave our stuff here?

8           THE COURT:  Yes.  The courtroom will be locked.

9       All right.  Very well.  Okay.  Thank you.  We stand

10  adjourned until then.

11      (Recess taken at 12:37 p.m.)

12      (At 1:44 p.m. on September 25, 2023; with counsel for the

13  parties and the defendant present; WITHOUT the jury:)

14          THE COURT:  We are back on the record outside of the

15  presence of the jury in United States of America versus Anthony

16  Unocic.

17      Counsel, is there anything that we need to take up before

18  we bring the jury?

19          MR. PACKARD:  No, Your Honor.

20          MR. REIMAN:  No, sir.

21          THE COURT:  All right.  Let's bring the jury.

22      (Jury in at 1:46 p.m.)

23          THE COURT:  You may be seated.  Good afternoon and

24  welcome back, ladies and gentlemen of the jury.  I've handed

25  you preliminary jury instructions.  I'll read them to you.  You

```
 1    can either listen to me or follow them in writing.  They'll be
 2    available to you in the jury room.
 3          (The Court read the Preliminary Jury Instructions.)
 4          THE COURT:  It's signed on this 25th day of September
 5    by myself.
 6       Counsel, are you ready to proceed with opening statement?
 7          MR. PACKARD:  Yes, Your Honor.
 8          THE COURT:  All right.  Mr. Packard, you may do so.
 9       (Opening statements were made by counsel.)
10          THE COURT:  Thank you, counsel.  And, counsel, who is
11    going to be having the first witness?
12          MS. FLIAM:  That will be me, Your Honor.
13          THE COURT:  Will you be questioning from counsel
14    table, or do you want the stand?
15          MS. FLIAM:  If we can move the podium, that would be
16    great.
17          THE COURT:  Dan, do you mind helping?  You want to
18    use the podium; right?
19          MS. FLIAM:  You know what?  I'll stick with --
20          MR. REIMAN:  I'm going to.
21          MS. FLIAM:  Okay.
22          THE COURT:  Yeah.  So it's fine.  Yeah.  We'll just
23    put it in the middle.  As long as you have a microphone, either
24    at the podium or counsel table.
25          MS. FLIAM:  May I call our witness, Your Honor?
```

Dedinsky - Direct (Fliam)                                        16

 1          THE COURT:  Yes, you may call your first witness.

 2          MS. FLIAM:  It will be Sergeant Michael Dedinsky.

 3          THE COURT:  All right.  Very well.  If you'd have a

 4   seat at the witness stand.

 5       Make yourself comfortable.

 6       Ms. Miller, you may swear the witness.

 7          COURTROOM DEPUTY:  Please state and spell your name

 8   for the record.

 9          THE WITNESS:  Michael Dedinsky, M-I-C-H-A-E-L,

10   D-E-D-I-N-S-K-Y.

11          COURTROOM DEPUTY:  Please raise your right hand.

12       MICHAEL DEDINSKY, PLAINTIFF'S WITNESS, SWORN

13          THE COURT:  Sergeant, I do have a court reporter

14   here.  I can already tell I'm going to have you slow down.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Okay.  All right.  Very well.  Ms. Fliam,

17   you may proceed.

18          MS. FLIAM:  Thank you.  I'm going to start by

19   apologizing to everybody for my voice.  It's a bad time to not

20   like goldenrod.

21                    DIRECT EXAMINATION

22   BY MS. FLIAM:

23   Q.   Sergeant, I'm going to start by having you tell the

24   jurors:  How are you employed?

25   A.   I'm employed with the Scotts Bluff County Detention Center

1    as the training sergeant at the facility.

2    Q.   And how long have you been in that position?

3    A.   Since October of 2019, so approximately about four years.

4    Q.   What are some of your current duties?

5    A.   I do all the training and hiring for new officers for the

6    county.  I do recertifications for them as well.  Sometimes I

7    assist with policies, procedures, and then I'm also a part-time

8    administrator over some of our technological systems.

9    Q.   And you say part time.  I believe you got drafted into

10   this position because of some maternity leave; is that right?

11   A.   That's correct.

12   Q.   How long total have you been with Scotts Bluff County?

13   A.   A little over five years now.

14   Q.   Now I want to talk very briefly about this Scotts Bluff

15   County Detention Center just as a facility as a whole.  Where

16   is that facility at?

17   A.   Scotts Bluff County, Nebraska, and specifically Gering,

18   the city.

19   Q.   Gering?

20   A.   Nebraska.

21   Q.   Gering, kind of misnamingly, is the county seat for Scotts

22   Bluff; is that right?

23   A.   Yes, it is.

24   Q.   How many beds does the Scotts Bluff County facility hold?

25   A.   286.

1    Q.    And does that make it the largest jail in the panhandle?

2    A.    Yes, it does.

3    Q.    How about in the state where does that rank?

4    A.    Fourth currently.

5    Q.    Now, does the Scotts Bluff County detention facility only

6    hold Nebraska detainees?

7    A.    No, it does not.

8    Q.    What other states does it work with?

9    A.    Currently we hold federal contracts with the United States

10   Marshal service out of North Dakota, South Dakota, Nebraska,

11   Wyoming, and Colorado, and through that federal contract we

12   oftentimes can also see individuals from ICE, immigration, U.S.

13   Secret Service, and other federal agencies.

14   Q.    I'm going to focus specifically on that Wyoming contract.

15   In general, who does -- what stages of proceedings are

16   detainees from the federal District of Wyoming at when they're

17   in Scotts Bluff?

18   A.    It could be any form of the process.

19   Q.    And if you have a federal detainee, is there a separate

20   place that federal inmates are held versus maybe local inmates,

21   or are they all blended together?

22   A.    Typically, they're all blended together.

23   Q.    Does Scotts Bluff house both male and female inmates?

24   A.    It does.

25   Q.    And is there -- I'm assuming they're kept separate; is

Dedinsky - Direct (Fliam)                                          19

1    that fair?

2    A.   Yes.

3    Q.   I want to talk specifically a little bit about the housing

4    arrangement in Scotts Bluff.  How are inmates housed?  Does

5    everybody just have a cell and everybody's locked in a cell, or

6    what's that look like?

7    A.   We have approximately 14 or more different housing units

8    that are specified based on classification of maximum, medium,

9    or minimum.  We do have some housing units mixed of open bay

10   systems, meaning there are no cell doors, and then we have some

11   that are cell doors as well.

12           THE COURT:  Again, Sergeant, I need you to slow down

13   just a little bit.

14           THE WITNESS:  Yes, Your Honor.

15   BY MS. FLIAM:

16   Q.   I'm going to talk to you specifically about what we've

17   been calling J pod.  Are you familiar with that?

18   A.   I am.

19   Q.   Tell me, what is J pod?

20   A.   J pod is referring to our south side of the facility

21   cardinal of directions speaking wise.  It used to be our

22   juvenile side.  In approximately 2017, 2018, it was renovated

23   to hold adult individuals.

24   Q.   It's the newer side of the jail; is that fair?

25   A.   Yes.

Dedinsky - Direct (Fliam)                                          20

1    Q.    And with J pod -- describe to me what that pod looks like.

2    A.    As you go in through the doors, you will see a large

3    dayroom.  In that dayroom, from there you'll see approximately

4    four small housing units that are connected to that, and then

5    there is a door referred to as J129 that has more sub housing

6    units beyond that, so approximately eight small housing units,

7    ranging from four beds to ten, with five lockdown cells.

8    Q.    And in that J pod is everything kind of self-contained in

9    that pod?

10   A.    You could say that, yes.

11   Q.    And so if an inmate is housed in the J pod, what all do

12   they have in that area?

13   A.    Inside of that unit they'll typically have their shower,

14   bathroom areas.  They will have their interior recreation

15   equipment, including board games, TV, things along that nature.

16   They will have their facility phone system, kiosk system.  They

17   will typically get fed inside of that unit as well.  There's a

18   library program, recreation areas available in that area as

19   well too.

20   Q.    So if I'm understanding correctly, if you are housed in J

21   pod, you're going to eat in that pod, shower in that pod,

22   entertain yourself in that pod.  It's not going to be where

23   you're transferred from there, say, out to eat and then come

24   back in?

25   A.    Correct.

1    Q.   Does the Scotts Bluff County Detention Center utilize kind

2    of a recordkeeping system to make sure inmates are where

3    they're supposed to be?

4    A.   It does.

5    Q.   And describe very briefly what that system looks like.

6    A.   It's referred to as our jail management system.  It's

7    called Central Square as of right now.  It's a vast system, but

8    typically that will create a facility roster and individual

9    profiles for each individual that's assigned there, including

10   things like cell transfer, cell locations, disciplinary

11   actions, charges, bond amounts.

12   Q.   I'm assuming at the most basic level it also keeps count

13   of who's in the jail at any given day and --

14   A.   It does.

15   Q.   Okay.  Can you run reports kind of historically, looking

16   back to see who was in the jail on a range of dates?

17   A.   You can.

18   Q.   And are these -- who's making these reports?

19   A.   Officers that have the permissions to do so have the

20   ability to create reports from the system, and then the system

21   itself also has the ability to generate the reports from the

22   information put in there with less manipulation by staff.

23            MS. FLIAM:  Your Honor, may I approach this witness?

24            THE COURT:  You may.

25            MS. FLIAM:  Thank you.

Dedinsky - Direct (Fliam)                                         22

1   BY MS. FLIAM:

2   Q.   All right.  Sergeant, I've handed you a couple of

3   exhibits.  I'm going to have you start with Exhibit 4.  Do you

4   recognize what Exhibit 4 is?

5   A.   I do.

6   Q.   What is Exhibit 4?

7   A.   It is a cell transfer log.

8   Q.   And tell me, just in general, what's a cell transfer log

9   tell you?

10  A.   Anytime an individual is relocated from one bunk to

11  another inside the facility, an officer will document that.

12  When an officer documents that on the profile, then you can

13  generate a report based off of that.

14  Q.   And the officers, when are they making this documentation?

15  A.   Relatively right after they make the movement.

16  Q.   And that information then can be, I take it, downloaded or

17  printed out of the computer?

18  A.   Correct.

19  Q.   And specific to Exhibit 4, what does this pertain to?

20  A.   I'm sorry.  Could you say that again.

21  Q.   Sure.  Specific to Exhibit 4, what inmate does this

22  pertain to?

23  A.   It appears to be Anthony Unocic.

24  Q.   And is Exhibit 4 a fair and accurate copy of that record

25  as it contains -- is contained at the Scotts Bluff County

Dedinsky - Direct (Fliam)                                    23

1    Detention Center?

2    A.   It is.

3              MS. FLIAM:  I'd offer 4.

4              THE COURT:  Any objection?

5              MR. REIMAN:  No.

6              THE COURT:  All right.  Exhibit 4 is received and you

7    may publish.

8              MS. FLIAM:  Thank you.

9         If we could publish Exhibit 4.

10   BY MS. FLIAM:

11   Q.   All right.  Officer, can you -- or sorry.  Sergeant, can

12   you see it on your screen?

13   A.   I can.

14   Q.   I'm going to have you just very briefly walk us through

15   which -- kind of each of these headings cover.  So obviously on

16   the left-hand side, we have the date.  What's that

17   memorializing?

18   A.   The date that it was entered into the system.

19   Q.   And the "from cell" I'm going to guess means where the

20   detainee is coming from?

21   A.   Correct.

22   Q.   And to whatever cell; correct?

23   A.   Yes.

24   Q.   I'm going to look at the entry closest to the top.  It

25   says J135D; is that right?

Dedinsky - Direct (Fliam)                                        24

1    A.    Yes, yes.

2    Q.    Tell me, what does J135D mean?

3    A.    J-135-DJ, referencing the south side housing unit, or J

4    pod 135, referencing the smaller sub housing unit inside of J

5    pod, "D" referencing D bunk of J135 housing unit.

6    Q.    So we're moving from bigger to smaller as we work through

7    this?

8    A.    Yes.

9    Q.    Okay.  And you've talked a little bit in general about J

10   pod, this housing unit 135.  What's max capacity for 135?

11   A.    Ten beds.

12   Q.    And is that the same layout you testified as pervades J

13   pod, there's that common area and the bunks --

14   A.    Yes.

15   Q.    -- showers, all self-contained?

16   A.    Correct.

17   Q.    And then "D," you said, was the bunk; is that right?

18   A.    Yes.

19           MS. FLIAM:  Thank you.  We can stop publishing

20   Exhibit 4.

21   BY MS. FLIAM:

22   Q.    I'm going to have you look at Exhibits 6 and 7, if you

23   would.  You have both 6 and 7 in front of you?

24   A.    I do.

25   Q.    And are these also the cell transfer logs?

Dedinsky - Direct (Fliam)                                    25

1    A.    They are.

2    Q.    Exhibit 6, what inmate is this for?

3    A.    Inmate Ryan Rivera.

4    Q.    And how about Exhibit 7, what inmate?

5    A.    Tracy Hoops.

6    Q.    Collected and created in the same way you've previously

7    testified to?

8    A.    Correct.

9    Q.    Are Exhibits 6 and 7 fair and accurate representations of

10   the inmate -- or the cell transfer logs for those inmates?

11   A.    They are.

12         MS. FLIAM:  I'd offer 6 and 7.

13         THE COURT:  Let's take these one at a time.  Any

14   objection to Exhibit 6?

15         MR. REIMAN:  No, sir.

16         THE COURT:  Exhibit 6 will be received.

17      And any objection to Exhibit 7?

18         MR. REIMAN:  No.

19         THE COURT:  Exhibit 7 will be received, and you may

20   publish either or both exhibits.

21         MS. FLIAM:  I'm going to start -- I think I'm only

22   going to publish 6 for the jury.  If we could start with 6.

23   BY MS. FLIAM:

24   Q.    All right.  Sergeant, see it on your screen?

25   A.    I do.

Dedinsky - Direct (Fliam)                                            26

1   Q.   Okay.  So we have -- and I'm going to work from the bottom

2   date and work our way up to the top here for Mr. Rivera.  I see

3   August 5th of 2021.  It says there's -- there's a blank from

4   the "from" cell.  What does that indicate to you?

5   A.   That they were pending intake.  They were getting

6   processed at booking.

7   Q.   So they had not come from any other place in the Scotts

8   Bluff County Jail?

9   A.   That's correct.

10  Q.   We see he starts with intox, and then on August 5th, that

11  same day, he's eventually moved to cell J135C.  Do you see

12  that?

13  A.   I do.

14  Q.   And then it looks like he stays in J135, and the letters

15  change; is that right?

16  A.   Yes.

17  Q.   What does that tell you?

18  A.   That he stayed inside of the same housing unit only

19  changing actual bunks.

20  Q.   Where -- and describe these bunks for us.  Is it just a

21  bunch of cots or....

22  A.   They are steel bunks secured to the wall.  There's only

23  two high.  There would be five sets of bunks in this housing

24  unit.

25  Q.   So five sets of bunk beds, in other words?

Dedinsky - Direct (Fliam)                                          27

1    A.   Yes.

2    Q.   Okay.  And are -- the bottom bunks, how are those

3    designated?

4    A.   It can vary based on the housing units down there.  In

5    this specific area, typically "A" would be a top bunk, "B"

6    would be a bottom bunk, "C" would be a top bunk, "D" would be a

7    bottom bunk, and so forth.

8    Q.   I think you told me they're referenced in the jail

9    computer system by alphabet, but if you actually look at the

10   bunks, they're numbered?

11   A.   By officers, yes.

12   Q.   Okay.  The last entry here, it's got the date.  It says

13   10/27/2021, and it notes Mr. Rivera was transferred from J135H

14   to J135F, and then there's no further record; is that right?

15   A.   Yes.

16   Q.   What does that tell you?

17   A.   That he remained in that housing location until his

18   release.

19   Q.   So the cell transfer log isn't going to tell us the actual

20   date the inmate released?

21   A.   That would be correct.

22   Q.   Do you still have Exhibit 3 in front of you?

23   A.   I do.

24        MS. FLIAM:  I'm going to have you pull 3 up.

25   BY MS. FLIAM:

Dedinsky - Direct (Fliam)                                          28

1    Q.    And briefly you -- tell us, what is Exhibit 3?

2    A.    It appears to be a report generated by my facility.

3    Q.    And this report also includes cell designations and

4    beginning and ending dates; is that correct?

5    A.    It appears so, yes.

6    Q.    Okay.  In reviewing this, does -- do all of the entries in

7    this report relate to J135?

8    A.    It does.

9    Q.    And again, there's a range of dates; is that accurate?

10   A.    Yes.

11   Q.    When you are looking at this, how is this -- how is

12   such -- how is this report generated?  Is it the same process

13   you testified to earlier?

14   A.    It is not.  This appears to be a different style of

15   report.

16   Q.    Okay.  Tell me how this report appears to have been

17   generated.

18   A.    The officers that have permissions to generate reports,

19   depending on how it is created in the system, there could be a

20   lot of fault in how it's generated, specifically formatting.

21   This appears to be a report that was pulled from cell occupancy

22   only, pulling from individuals that had been in certain

23   locations from one given time to another.

24   Q.    So this is looking at in this case J135 and occupants of

25   that cell between a given range of dates?

Dedinsky - Direct (Fliam)                                    29

1    A.    Yes.

2    Q.    And this runs, it looks like, from November of 2021 to, I

3    think, April of 2022?

4    A.    Without seeing it in the system, I can't say as to when it

5    was exactly generated, from what date to what date, but it

6    appears those would be the dates that were generated in the

7    report.

8    Q.    That's when the begin and end dates cover?

9    A.    Yes.

10    Q.    Okay.  Fair and accurate depiction of the report as ran by

11    your system?

12    A.    Yes.

13              MS. FLIAM:  And I'd offer 3.

14              THE COURT:  Any objection?

15              MR. REIMAN:  No.

16              THE COURT:  Exhibit 3 is received.  You may publish.

17              MS. FLIAM:  I would ask if we could publish.

18    BY MS. FLIAM:

19    Q.    Do you see Mr. Unocic's name on this page?

20    A.    I do.

21    Q.    All right.  And it tells us -- well, we've got a date.  It

22    starts, I believe, December 29th of 2021.  Do you see that?

23    A.    I do.

24    Q.    And what would that date reference in this form of report?

25    A.    That at one point he was incarcerated in that exact

Dedinsky - Direct (Fliam)                                          30

1    location.

2    Q.    Okay.  And it shows an ending date, then, of March 8th,

3    2022, per this report?

4    A.    It does on this, yes.

5    Q.    All right.  I'm going to have you go ahead and set that

6    aside as well, and I want to move and talk a little bit about

7    the surveillance system at Scotts Bluff County.  Are you

8    familiar with the video camera system that the Scotts Bluff

9    Jail employs?

10   A.    I am.

11   Q.    In fact, I think you got to install the new one; is that

12   right?

13   A.    That's correct.

14   Q.    When did that new camera system go into effect?

15   A.    The install started September of last year.

16   Q.    September of 2022?

17   A.    Yes.

18   Q.    Okay.  I want to talk, then, about the previous camera

19   system.  Were you also familiar with that one?

20   A.    Yes.

21   Q.    And tell us, was there a camera or cameras involved with

22   J135?

23   A.    There was two in that housing unit at the time.

24   Q.    Okay.  Tell me in general where were they located?

25   A.    As you walk into the door of the housing unit,

Dedinsky - Direct (Fliam)                                      31

1    approximately 10 feet in front of you above the TV to the left

2    there would be one located.  As you walk into the housing unit,

3    you will go around a corner to the right to where you will see

4    all the bunks, and at the very end of the wall, there will be

5    one approximately above the ceiling in the middle of the wall.

6    Q.    Okay.  Did it cover most -- did those two cameras, then,

7    cover most of that housing unit?

8    A.    Yes.

9    Q.    Are there areas that you can't record in?

10   A.    Typically in bathroom areas, yes.

11   Q.    And what's the purpose of having a surveillance system

12   inside the jail?

13   A.    Safety and security.

14   Q.    Now, with that surveillance system can employees such as

15   yourself access that surveillance in live time?

16   A.    Yes.

17   Q.    Is it typically monitored in live time?

18   A.    In our control tower it is.

19   Q.    What's controlled -- what's the control tower looking for?

20   A.    Obvious safety and security things, including such as

21   fights, medical emergencies, anything along those lines.

22   Q.    How many cameras total did the Scotts Bluff County

23   security -- or how many cameras were involved with the facility

24   at that time, if you know?

25   A.    Approximately 120.

Dedinsky - Direct (Fliam)                                     32

1    Q.    And how many people would work in that control at any

2    time?

3    A.    Two.

4    Q.    Those approximate 120 cameras, did they also record and

5    save?

6    A.    About 100 of them did.

7    Q.    And how could that saved surveillance be accessed?

8    A.    You had to be a supervisor rank to be able to access that.

9    Our county IT department generated the login information for

10   that at the request of a jail administrator.

11   Q.    Okay.  So in a situation -- say law enforcement approached

12   and needed surveillance from a specific date.  That was

13   something they would have to go through admin for?

14   A.    Or a sergeant running the shift.

15   Q.    How long did -- that video surveillance, how long was that

16   stored?

17   A.    I'm not exactly sure the exact time frame.

18   Q.    Fair to say with that much data at some point you do have

19   to purge?

20   A.    Yes.

21   Q.    And along those same lines, do these cameras capture

22   audio?

23   A.    They do not.

24   Q.    And in general, why no audio?

25   A.    Two reasons specifically.  First and foremost is storage.

Dedinsky - Direct (Fliam)                                          33

 1   That would be quite a large amount of information to be stored
 2   on site.  Second of all is money.  The cost of it would be
 3   additional.
 4   Q.    Okay.  But if there is, at least the video portion for a
 5   time period can be reassessed?
 6   A.    Correct.
 7   Q.    Reaccessed.  Is the Scotts Bluff County Detention facility
 8   located here in Nebraska?
 9   A.    Yes, it is.
10         MS. FLIAM:  Just a moment, Your Honor.
11   BY MS. FLIAM:
12   Q.    Okay.  Sticking with the video surveillance for just a
13   second here, when you're going back to pull up, say, saved
14   videos, how are you -- are you able to search by date?
15   A.    You are.
16   Q.    Okay.  And so you can pinpoint to a specific date or a
17   range of dates if you need to?
18   A.    Uh-huh, yes.
19   Q.    And I'm going to go -- have you very briefly turn back to
20   those exhibits.
21         MS. FLIAM:  If we could pull up Exhibit -- let's
22   start with 3.  And then, actually, could Ms. Sump publish
23   page 2 of Exhibit 3?
24   BY MS. FLIAM:
25   Q.    Sergeant, we're looking at Mr. Hoops here.  Do you see his

Dedinsky - Direct (Fliam)                                      34

1   name on there?  Okay.

2   A.   I do.

3   Q.   And it shows J135H, and it has the begin date of March 2nd

4   and an end date of April 4th.  Do you see that?

5   A.   I do.

6          MS. FLIAM:  And then if we could pull up Exhibit 7.

7   BY MS. FLIAM:

8   Q.   Exhibit 7, you testified earlier this is the cell

9   transfer -- or the log for Mr. Hoops; is that right?

10  A.   Yes.

11  Q.   Can you tell me the first time you see him in that J135

12  pod.

13  A.   Appears to be January 2nd, 2022.

14  Q.   That's about four entries down; is that right?

15  A.   Yes.

16  Q.   Can you explain why this report would have an earlier date

17  for him in that J pod versus Exhibit 3.

18  A.   First, Exhibit 3, that was an officer-generated report.

19  So this one varies.  It pulls directly from an entry put into

20  the system so there is no manipulation.  It's pulling directly

21  from the entry that was made.

22  Q.   Okay.  So this is exactly when that inmate came into that

23  pod?

24  A.   That's correct.

25  Q.   All right.  Thank you very much.

1          MS. FLIAM:  I don't believe I have any other

2     questions for the sergeant.

3          THE COURT:  All right.  Very well.

4     Cross-examination, Mr. Reiman.

5                         CROSS-EXAMINATION

6     BY MR. REIMAN:

7     Q.   Sergeant Dedinsky, what again is your job duties there at

8     the jail?

9     A.   Training sergeant.

10    Q.   Okay.  And it sounds like you have some knowledge about

11    all the video equipment; is that right?

12    A.   Yes, sir.

13    Q.   And do you also have knowledge about the other parts of

14    the jail facility and how they're run?

15    A.   To an extent, yes.

16    Q.   Specifically, the phones?

17    A.   Some knowledge.

18    Q.   What phone system does the jail out there work with?

19    A.   Inmate Calling Solutions.

20    Q.   Okay.  And is that one of those phone systems that records

21    all the phone calls as well?

22    A.   It does.

23    Q.   And you can go back and listen to phone calls that

24    happened a couple months ago?

25    A.   It does.

Dedinsky - Cross                                                    36

1   Q.   And does an inmate get a PIN number?  Is that how it
2   works?
3   A.   It is.
4   Q.   And if they want to make a phone call, they put their PIN
5   in; is that right?
6   A.   Yes.
7   Q.   And then, say, in a couple months a police officer asks,
8   Pull me all the phone calls for their target, you would be able
9   to use that PIN and go in and pull up every phone call they
10  had; is that correct?
11  A.   That officer would have to get prescreened to be able to
12  access the system and provide their credentials first, but yes.
13  Q.   Okay.  I think, other than attorney calls, you can pull up
14  every phone call; is that --
15  A.   That's correct, yes.
16  Q.   Okay.  And so, let's see, you have monitors on the --
17  you're monitoring all the inmates 24/7, other than when they're
18  in the bathroom, when they're in the jail; is that right?
19  A.   Yes.
20  Q.   And you're also able to monitor and pull up any phone call
21  that goes out of that jail; is that correct?
22  A.   Yes.
23  Q.   And do you also look and examine their mail out there?
24  A.   I don't know exactly what the process was at that time.
25  It has recently changed in about the last year.  We've gone to

Dedinsky - Redirect (Fliam)                                    37

1    a vendor that goes through a tablet system where it's all

2    prescreened that way now.

3    Q.   Okay.  So if somebody is sending out concerning mail, you

4    guys would catch it?

5    A.   Not all the time.  It's not monitored every single letter

6    when it goes out.

7    Q.   If somebody was making threatening phone calls, you guys

8    would be able to pull those phone calls?

9    A.   Possibly, yes.

10           MR. REIMAN:  Okay.  That's all the questions I have.

11   Thank you.

12           THE COURT:  All right.  Very well.  Any redirect?

13                      REDIRECT EXAMINATION

14   BY MS. FLIAM:

15   Q.   Mr. Reiman was asking you questions about the telephone

16   system and not specifically what you're covering for maternity

17   leave -- someone who's on maternity leave; is that --

18   A.   That is correct, yes.

19   Q.   With the call system every inmate has their own account;

20   is that right?

21   A.   Yes.

22   Q.   And they have -- are there steps taken to secure that

23   account so only that inmate can use it?

24   A.   There are.  When an inmate gets booked in at intake, the

25   jail management system generates what is referred to as a

Dedinsky - Redirect (Fliam)                                    38

1    jacket number.  It's their jail ID number.  That in conjunction

2    with a four-digit code that is either randomly generated or

3    selected by the officer or inmate is added.  They will then go

4    to the facility phone system to enroll, and in that phone

5    system they will also have to say "United States of America"

6    three times to register the biometrics of their voice in

7    conjunction with the PIN number.

8    Q.   That four-digit code?

9    A.   Correct.

10   Q.   Do inmates, to your knowledge, ever trade PINS?

11   A.   They do.

12   Q.   And so some inmates can or do call out on other people's

13   accounts?

14   A.   They do.

15   Q.   And if you -- how can you search that telephone database,

16   do you know?

17   A.   Typically it's based on the actual inmate.  When they

18   register, it creates similar to an account for them.

19   Q.   So you're looking, in other words, for the username?

20   A.   Their name specifically, yes.

21   Q.   So if I am an inmate in the Scotts Bluff County Detention

22   Center and I register under my name but then I trade and allow

23   somebody else to make calls under my name, there's no way to

24   know?

25   A.   It will still register under your account.  You have to --

Dedinsky - Redirect (Fliam)                                    39

1    the voice biometrics will register at the calling process.

2    If -- after you pass those, you could pass the phone over to

3    somebody else, and it would still link to your account.

4    Q.   Okay.  I appreciate that.

5            MS. FLIAM:  I don't have any other questions.

6            THE COURT:  All right.  Very well.  May this witness

7    be excused?

8            MR. REIMAN:  Yes.  Thank you.

9            MS. FLIAM:  Yes.

10           THE COURT:  All right.  Thank you, Sergeant.  You are

11   excused from these proceedings.

12       And the government may call its next witness.

13           MR. PACKARD:  Government calls David Tubbs.

14           THE COURT:  All right.  Agent Tubbs, if you'd take a

15   seat at the witness stand, please.

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  If you'd have a seat.  Make yourself

18   comfortable, and we'll have you sworn as a witness.

19           THE WITNESS:  Yes, Your Honor.

20           COURTROOM DEPUTY:  Please state and spell your name

21   for the record.

22           THE WITNESS:  My name is David Tubbs.  Last name is

23   spelled T-U-B-B-S.

24           COURTROOM DEPUTY:  Please raise your right hand.

25            DAVID TUBBS, PLAINTIFF'S WITNESS, SWORN

1          THE COURT:  All right.  Very well.  You may proceed,

2     counsel.

3                        DIRECT EXAMINATION

4     BY MR. PACKARD:

5     Q.    Good afternoon, Agent Tubbs.

6     A.    Good afternoon.

7     Q.    How are you employed?

8     A.    I'm employed with the Bureau of Alcohol, Tobacco, Firearms

9     and Explosives, which is commonly known as the ATF.

10    Q.    How long have you worked for them?

11    A.    I was hired in 2000 -- or 2020, and after training began

12    working in Cheyenne in May of 2021.

13    Q.    What is your current assignment?

14    A.    I'm currently a special agent assigned to Wyoming, and I

15    investigate violent crime surrounding the use of firearms,

16    arson, and explosives.

17    Q.    And do you have law enforcement experience prior to ATF?

18    A.    I do.

19    Q.    Can you tell us about that.

20    A.    So I started my law enforcement career in 2010 in

21    Colorado.  I was a police officer for approximately ten years

22    in Lakewood, Colorado, at the Lakewood Police Department.

23    Q.    What kinds of things did you do for the Lakewood Police

24    Department?

25    A.    Most of my time there was spent on patrol.  I did patrol

Tubbs - Direct (Packard)                                          41

1    for approximately seven years, and the last three years I

2    worked in basically a fugitive team that was called Special

3    Enforcement Team, but we were responsible for fugitives with

4    outstanding warrants.

5    Q.    Do you have any experience related to firearms or work

6    experience?

7    A.    Yes.

8    Q.    Can you tell us briefly about that.

9    A.    Yeah.  Throughout my ten years in Lakewood as a patrol

10   officer, you know, I had come in contact with firearms fairly

11   frequently.  We are trained in the academy at a local level.

12   And then throughout my duration there, I was able to become a

13   firearms instructor, and I was on SWAT as well.  And then after

14   my local law enforcement career, I transitioned to ATF and also

15   got training at the ATF National Academy as well.

16   Q.    What is SWAT?

17   A.    Excuse me.  SWAT is special weapons and tactics, and the

18   responsibility of the SWAT team is typically to respond to, you

19   know, high-risk active calls for service, to assist patrol

20   officers, and then also to execute, you know, what we would

21   call preplanned search warrants.

22   Q.    What's your business address?

23   A.    In Cheyenne the business address for ATF is 2120 Capitol

24   Avenue, Suite 3007.

25   Q.    Is that like a federal building kind of like it is here in

1    Lincoln?

2    A.    It is.

3    Q.    How many stories?

4    A.    I believe it has approximately seven stories.

5    Q.    So if somebody wanted to Google search it, for example,

6    they just look up "federal building" or look up "ATF," and you

7    can find it; is that right?

8    A.    That's correct.

9    Q.    It's a public building; is that correct?

10   A.    That's correct.

11   Q.    Similar to what we're in right now; is that right?

12   A.    I would say it's very similar.

13   Q.    How many agents work in the Cheyenne branch of the ATF?

14   A.    Currently we have only two agents and an acting

15   supervisor.

16   Q.    So a total of three?

17   A.    Correct.

18   Q.    Is that about what it was back in 2021 and 2022?

19   A.    At that time we had, I believe, two additional agents and

20   then one that was completing training but assisting at the

21   Cheyenne Field Office, so four with a supervisor and then one

22   that was kind of in between, helping out.

23   Q.    Did you participate in an investigation of Anthony

24   Unocic -- excuse me, Unocic related to possession of firearms

25   and suppressors in 2021 and 2022?

1   A.   I did.

2   Q.   We'll get to that in just a moment, but I want to talk --

3   or ask you a little bit more about your training.  Do you have

4   some training with respect to gun kits and ghost guns?

5   A.   Yes.

6   Q.   Can you explain what those are to the jury and what

7   training you've had about them.

8   A.   So just over the course of the last several years, the

9   ghost guns, you know, obviously that's become, you know,

10  public.  You've heard of them.  They're called PMFs, or

11  privately made firearms, so they contain no markings on these

12  firearms.  And typically you'll see a manufacturer or a make --

13  sorry.  Manufacturer is the make, and then you'll see the

14  model, the caliber, and maybe like an importer and obviously a

15  serial number.  Well, those PMFs or what they are commonly

16  called, you know, as ghost guns don't contain any of that, and

17  that's -- that's hence the name.

18  Q.   So these are unserialized firearms that people can make at

19  home; is that fair?

20  A.   Correct.

21  Q.   All right.  And what is a suppressor, and do you have

22  training with respect to suppressors?

23  A.   Sure.  So a suppressor is a device -- without getting too

24  nitty-gritty into the technical definition, it is a device that

25  you can attach to a firearm, and it diminishes the re- -- they

Tubbs - Direct (Packard)                                          44

1    call it the report or the sound that comes from the

2    explosive -- or the projectile out of the end of the barrel, or

3    the muzzle, we call it.  So it quiets that sound essentially,

4    and that's its purpose.  It has some other purposes.  It may

5    mitigate recoil or not, but it will quiet the sound of that

6    explosion at the end of the muzzle.

7    Q.   Can you give us an example of a suppressor that you've

8    seen or worked with.

9    A.   Yeah, yeah.  Yeah.  I've seen -- and you may hear common

10   names in the industry.  You know, like, a SureFire is a very

11   common silencer or suppressor, and they have a cylinder tube.

12   You attach it to the firearm, and there's different ways to do

13   that.  But yeah, I've had experience with them, and they're

14   commonly used nowadays even in law enforcement and in hunting

15   as well.

16   Q.   And does a person have to get some sort of a permit or

17   license to have one of those?

18   A.   They do.

19   Q.   And are those the kinds of cases that sometimes you

20   investigate?

21   A.   Yes.

22   Q.   And did that sort of allegation lead to your involvement

23   with Mr. Unocic in this case?

24   A.   Yes.

25   Q.   Do you, as an ATF agent, have some training and/or

Tubbs - Direct (Packard)                                    45

1  experience with explosives?

2  A.    Yes.

3  Q.    And actually "explosives" is in the acronym of ATF, so

4  that's part of the subject matter that you cover; is that

5  right?

6  A.    That's correct.

7  Q.    And generally what's your experience and training with

8  explosives?

9  A.    So as a special agent, your experience is mostly going to

10  occur at the academy.  It's typically a week to a week and a

11  half, roughly, on explosives.  And then in the field, you know,

12  you could be exposed to those types of investigations.

13  Obviously that's situational dependent, but you also have

14  assistance from specialized individuals that have training in

15  explosives as well.

16  Q.    In this case did the ATF Field Office in Cheyenne have a

17  designated expert on explosives?

18  A.    We did.  Not in Cheyenne, but there is one in the Denver

19  Field Division.

20  Q.    And who is that?

21  A.    At the time it was Steve Shelly.

22  Q.    Could you spell that.

23  A.    Yeah.  I believe it's S-H-E-L-L- -- I believe it's "Y."

24  Q.    And he's somebody who's done more than just the week-long

25  training in explosives; is that right?

Tubbs - Direct (Packard)                                           46

1    A.    That's correct.

2    Q.    And did he participate in the interview of Mr. Unocic

3    November 2, 2021?

4    A.    He did.

5    Q.    All right.  Let's talk about --

6          THE COURT:  Before we move on, counsel, is this an

7    appropriate time to break?

8          MR. PACKARD:  Yes, Your Honor.

9          THE COURT:  Okay.  We're going to take our

10   midafternoon break at this point in time, ladies and gentlemen

11   of the jury.  And as I've instructed you before, I want to

12   remind you that until this trial is completed, you're not to

13   discuss the evidence or this trial with anyone, including each

14   other.

15        We're going to take about a 15-minute break at this point

16   in time, and we'll reconvene at about 3:18 or 3:20.

17        All right.  Thank you.  We'll take a break.

18        (Jury out at 3:03 p.m.)

19          THE COURT:  You may be seated.  And, counsel, is

20   there anything we need to take up before we break?

21          MR. PACKARD:  No, Your Honor.

22          MR. REIMAN:  I'll go ahead and --

23          THE COURT:  Pardon?

24          MR. REIMAN:  It sounds like we're getting into the

25   2021 stuff so maybe this would be a good time.

Tubbs - Direct (Packard)                                          47

1         I'll make a general objection that none of this 2021, the

2    silencer investigation, should be -- I submit it's a prior bad

3    act.  The prejudice outweighs any insight that it can give the

4    jury.  So I would make this overarching objection at this point

5    in time regarding the silencer investigation.

6              THE COURT:  With respect to 2021?

7              MR. REIMAN:  Yes, sir.

8              THE COURT:  Yeah.  And I have ruled upon that, and

9    I'll stand on the rulings that have already been made.  So the

10   objection is noted, and it can be a general objection as to

11   2021.  It's overruled, but if there are specific matters as to

12   relevance or 403, then you'll have to raise those.  Okay?

13             MR. REIMAN:  Yes, sir.

14             THE COURT:  So the objection is noted and overruled.

15       All right.  Anything further?

16             MR. REIMAN:  No, sir.  Thank you.

17             THE COURT:  All right.  Very well.  We'll take a

18   15-minute break, and we'll reconvene just a little bit before

19   3:20.  Thank you.

20       (Recess taken at 3:04 p.m.)

21       (At 3:26 p.m. on September 25, 2023; with counsel for the

22   parties and the defendant present; WITHOUT the jury:)

23             THE COURT:  Counsel, anything we need to take up

24   before we bring the jury?

25             MR. REIMAN:  No, sir.

1          MR. PACKARD:  Not from the government.

2          THE COURT:  All right.  Very well.  And before we

3    bring the jury, right before we broke, Mr. Reiman did make his

4    global objection, which was noted and overruled, and I referred

5    to my prior ruling.  Just so the record is clean, that was in

6    filing number 50 -- I think it was pages 4 to 6 -- where I

7    explained that the 2021 incidents and charges are not 404 prior

8    bad acts, but the 2021 underlying facts are intrinsically

9    intertwined with this offense and the charged offense.  So I

10   just wanted to be clear on the ruling.

11         All right.  Let's bring the jury.

12         MR. REIMAN:  Your Honor, one second.  I think in

13   about four or five questions, Mr. Packard is going to bring up

14   2015.

15         THE COURT:  Yeah.

16         MR. REIMAN:  So I'll make -- rather than approach,

17   can I just make the objection right now?  Same type of thing,

18   relevance, 403, prior bad act, and I'd ask that none of the

19   2015 incident comes in against Mr. Unocic.

20         THE COURT:  Yes, you may do so.

21         MR. REIMAN:  Thank you.

22         THE COURT:  The objection is noted and overruled.  I

23   will be giving a limiting instruction as to the 2015 charge

24   once that is offered, and so once you start getting into that,

25   I will give the limiting instruction.

Tubbs - Direct (Packard)                                    49

1           MR. PACKARD:  And just for the record, we're talking

2     about Exhibit 11, and this investigation actually happened in

3     2014 --

4           THE COURT:  Yeah.

5           MR. PACKARD:  -- and I think court involvement

6     happened in 2015, but he wasn't convicted till 2017.

7           THE COURT:  Right.

8           MR. PACKARD:  So Exhibit 11 is what we're talking --

9           THE COURT:  It is Exhibit 11 that we're talking

10    about.  Before we get into Exhibit 11, I will give the limiting

11    instruction.  Okay?

12          MR. REIMAN:  Thank you.

13          THE COURT:  Very well.  But the objection is noted,

14    and we had talked about it on Friday also, and it's overruled

15    for the reasons stated.

16       Okay.  All right.  And of course that is being considered

17    for the limited purpose of deciding -- allowing the jury to

18    decide Mr. Unocic's either motive, intent, knowledge, or

19    absence of mistake with respect to committing the crime in this

20    particular case.

21       All right.  Bring the jury.

22          DAVID TUBBS, PREVIOUSLY SWORN, RESUMED THE STAND

23       (Jury in at 3:29 p.m.)

24          THE COURT:  You may be seated.  All right.

25    Mr. Packard, I believe you were in direct exam with Agent Tubbs

1    when we broke.  Are you ready to proceed?

2                 MR. PACKARD:  Yes, Your Honor.

3                 THE COURT:  And you may do so.

4                        DIRECT EXAMINATION RESUMED

5    BY MR. PACKARD:

6    Q.   Agent Tubbs, I'd like to turn your attention to why we're

7    all here and your investigation in this case.  Did your

8    investigation start in October of 2021?

9    A.   Yes.

10   Q.   Can you tell us how you got involved.

11   A.   Yes.  Approximately October 7th of 2021, there was a

12   package that was intercepted by customs.  It was inbound.  This

13   is the LA facility, so West Coast, inbound from China to an

14   address, 709 Cleveland Avenue in Cheyenne, Wyoming, and the

15   sender was Chinese or from China, and the recipient was listed

16   as a Tony Pierce, and that package was identified by U.S.

17   Customs as a suspected silencer or suppressor.

18   Q.   And did law enforcement agents actually go through the

19   package or find out what was in the package?

20   A.   Yeah.  So my understanding is customs has their protocols

21   and policies and procedures and then they will notify Homeland

22   Security or HSI, and then that's what they did in this case,

23   and Homeland Security or HSI notified ATF.

24   Q.   And did the package contain a silencer or suppressor or

25   something like that?

Tubbs - Direct (Packard)                                    51

1    A.    It did.

2    Q.    What's the next step in the investigation?

3    A.    There was -- so shortly after the 7th, there was

4    surveillance conducted at 709 Cleveland Avenue to obtain just

5    more information on anything that could be observed.

6    Q.    So somehow the West Coast and LA communicates to the ATF,

7    which involves you or your being assigned to the case.  Is that

8    kind of how that worked?

9    A.    That's correct.  We got informed by the HSI agents about

10   the suspected silencer and suppressor, and at some point after

11   that, the ATF agents, including myself, inspected this package

12   or the suspected suppressor and silencer and determined that it

13   could, in fact, function as one.

14   Q.    What was your role in the Wyoming investigation?

15   A.    I was what we would call the lead case agent.

16   Q.    And how long had you been an ATF agent at the time?

17   A.    It would have been just since May of -- I guess I should

18   say I was hired technically in July of 2020 and then attended

19   the training academies and then began working in the field in

20   May of '21, so several months.

21   Q.    So then what's the plan after you realize there's an

22   address, it's to a Tony Pierce, and you've got a suppressor or

23   silencer?  What steps do you plan to do next?

24   A.    So after that there was address queries conducted, and we

25   can utilize the United States Postal Service for that as well,

1    and we learned that there was a change of address conducted by

2    the defendant that showed that his change of address or current

3    address would have been the 709 Cleveland Avenue address.

4    Q.   And did you verify that Mr. Anthony Unocic resided at 709

5    Cleveland?

6    A.   Yes.

7    Q.   And did you and other agents perform surveillance of that

8    address?

9    A.   Yes.

10   Q.   What's a general description of that address?

11   A.   The physical description?

12   Q.   Yes.

13   A.   I would describe it as like a standard -- almost like a

14   trilevel but a single story with a basement, just a standard

15   sized home with a attached garage.

16   Q.   And did you figure out what type of vehicle Mr. Unocic

17   drove?

18   A.   Yes.

19   Q.   And did you see that vehicle there as well?

20   A.   Yes.

21   Q.   And what kind of car was that?

22   A.   It was a black GMC Yukon Denali.

23   Q.   Is that a SUV?

24   A.   Yes.

25   Q.   And over the course of several days or weeks, did you and

Tubbs - Direct (Packard)                                        53

1   others watch the house without the inhabitants knowing?

2   A.   Yes, we did.

3   Q.   And what was the purpose of that?

4   A.   The purpose was to just establish who resided there and

5   then to also confirm, you know, the defendant did, in fact,

6   live there, so we wanted to give it enough time just to confirm

7   that that was his place of residence.

8   Q.   And were you able to gather some evidence from

9   surveillance showing that Mr. Unocic lived there with two

10  roommates?

11  A.   Yes.

12  Q.   And did you gather evidence showing that he worked at the

13  Veterans Administration?

14  A.   Yes.

15  Q.   And is this in downtown -- or not downtown, but the town

16  of Cheyenne?

17  A.   Yes.  It was the veterans or VA Hospital.

18  Q.   Did you ever figure out what he did there?

19  A.   Yeah.  I believe he was generally involved in maintenance

20  and maybe some sort of janitorial-type work, kind of a

21  do-it-all, you know, at the VA.

22  Q.   On October 2021, did you actually examine the suppressor

23  and form an opinion?

24  A.   Yes.

25  Q.   And tell me about that.

1   A.   Yes.  So myself and another ATF agent physically examined

2   the silencer or -- I'm referring to silencer and suppressor

3   kind of interchangeably.  We reviewed it in person at the HSI

4   facility.

5   Q.   And again, this is the one that had been intercepted in LA

6   but sent along to you in Cheyenne; correct?

7   A.   That's correct.

8   Q.   And it was addressed to Tony Pierce at 709 Cleveland in

9   Cheyenne?

10  A.   That's correct.

11  Q.   Did you author three search warrants in this case?

12  A.   Yes.

13  Q.   And was that for 709 Cleveland, the house; the black GMC

14  Yukon; and Mr. Unocic's person?

15  A.   Yes.

16  Q.   After doing the surveillance did you and other agents come

17  up with a plan for how you -- what you were going to do, how

18  you were going to bring this to conclusion?

19  A.   Yes.

20  Q.   And what was the plan?

21  A.   The plan was to conduct a controlled delivery, so the

22  United States Postal Service would assist in this.  They would

23  take the package and deliver it to the address at 709 Cleveland

24  Avenue while surveillance is being done.  And obviously, the

25  inspector with U.S. Postal is a sworn federal agent as well, so

Tubbs - Direct (Packard)                                    55

1    they would be used, and there was reasons for that, but it's

2    basically called a controlled delivery.

3    Q.    "Controlled" meaning people are -- law enforcement are

4    watching it and setting it up; is that correct?

5    A.    That's correct.

6    Q.    And did the controlled delivery take place?

7    A.    Yes.

8    Q.    Did Mr. Unocic receive the package?

9    A.    He did.

10   Q.    And what's the next step in the investigation?

11   A.    After that we just continued surveillance and observed the

12   defendant leave the address and go to his place of employment

13   at the VA.

14   Q.    And what do you do after you see him leave?

15   A.    We just follow him to his work to the VA while -- excuse

16   me, while other agents maintained surveillance at the house.

17   Q.    So did you then interview Mr. Unocic, or did you search

18   his house, or both?

19   A.    Yes, both.  I interviewed the defendant first.

20   Q.    All right.  Let's talk about the house and then the

21   interview.  Okay?  So you went back --

22            THE COURT:  I'm sorry, counsel.  Do we have a date on

23   this?

24            MR. PACKARD:  Yeah.  I'm sorry.

25            THE COURT:  I'm not sure if I missed it.

1          MR. PACKARD:  No.  I forgot that.

2    BY MR. PACKARD:

3    Q.   What date are we talking about?

4    A.   This was November 2nd, 2021.

5          THE COURT:  Thank you.

6    BY MR. PACKARD:

7    Q.   So the package intercept happened on October 7, and now

8    we're at November 2nd?

9    A.   That's correct.

10   Q.   And can you give the jury an idea of just basically what

11   steps and paperwork are involved when you get a search warrant.

12   How is your name attached to that?

13   A.   So as the affiant, the person that drafts or writes the

14   search warrant, your name -- or my name in this case -- as the

15   federal law enforcement officer is going to be, you know, at

16   the bottom of these warrants, and then we obviously swear it

17   out in front of a judge, and it is signed by the agent.

18   Q.   So a search warrant involves an affidavit which is signed

19   by you; is that right?

20   A.   Correct.

21   Q.   Kind of like a report summarizing what evidence you have;

22   is that right?

23   A.   Correct.

24   Q.   You swear that it's true and correct; is that right?

25   A.   Yes.

Tubbs - Direct (Packard)                                     57

1    Q.    Then there's some kind of application paperwork saying, "I

2    want to go search this particular place."  Right?

3    A.    Correct.

4    Q.    Then at the back there's kind of an order that -- or

5    excuse me.  There's a part where you specifically describe what

6    you want to search; right?

7    A.    Correct.

8    Q.    And then ultimately you take it to a judge, and the judge

9    gives you permission by signing an order authorizing the search

10   warrant; is that right?

11   A.    That's right.

12   Q.    And then when you're all done executing that search

13   warrant, searching the stuff, you leave what's called a return;

14   is that right?

15   A.    Correct.

16   Q.    Tell the jury what the return is.

17   A.    The return is going to -- it's a piece of paper or pieces

18   of paper that are going to show what evidentiary items were

19   seized or collected from wherever, whether that's the person,

20   the vehicle, or the house, and it's going to list those items

21   so in this case the defendant or anybody else can see what was

22   taken during the search warrant execution.

23   Q.    And does that return have your name at the bottom, Special

24   Agent David Tubbs?

25   A.    Yes.

Tubbs - Direct (Packard)                                    58

1    Q.   Did you leave that piece of paper at Mr. Unocic's

2    residence after you executed the search warrant on November 2?

3    A.   Yes.

4    Q.   Did you leave that piece of paper in his GMC Yukon after

5    the search of the car was completed?

6    A.   Yes.

7    Q.   All right.  Let's talk about the search of the home.  How

8    many people participated?

9    A.   I would say there was approximately 10 to 15 individuals

10   from ATF, HSI, and then some of the specialized individuals as

11   well that were there, and then the supervisors.

12   Q.   And before executing that search warrant on November 2,

13   were you aware of a 2014, 2015 investigation that helped inform

14   decisions you made in this case?

15   A.   Yes.

16        MR. REIMAN:  Your Honor, I'll launch my objection

17   just in case I haven't already.  Thank you.

18        THE COURT:  All right.  And, counsel, the objection

19   will be overruled.

20        But ladies and gentlemen of the jury, you're about to hear

21   either evidence or testimony that Mr. Unocic was previously

22   convicted of illegally possessing an explosive device in 2017.

23   I want you to understand that Mr. Unocic is only on trial for

24   the crime charged in the indictment.  This evidence may be

25   considered by you for the limited purpose of deciding

1    Mr. Unocic's motive, intent, knowledge, or absence of mistake

2    to commit the crime charged in this case.  This evidence may

3    not be considered by you for any other purpose, and the weight

4    that you give the evidence is entirely up to you.

5         All right.  Very well.  So with that instructed, you may

6    proceed, counsel.

7              MR. PACKARD:  I'd like to show the witness

8    Exhibit 11.  May I approach?

9              THE COURT:  Yes, you may.

10   BY MR. PACKARD:

11   Q.   Special Agent Tubbs, have you seen Exhibit 11 before?

12   A.   Yes, I have.

13   Q.   Does Exhibit 11 appear to be a certified copy of a prior

14   conviction out of Colorado dated January 27, 2017?

15   A.   Yes.

16   Q.   And did the information contained in Exhibit 11 and the

17   facts that underlie that conviction help you and other agents

18   make choices about how to investigate this current suppressor

19   investigation?

20   A.   Yes.

21             MR. PACKARD:  I'll offer Exhibit 11 and ask to

22   publish that.

23             THE COURT:  All right.  And that's been objected to,

24   and the objection is overruled for the reasons stated.

25             MR. REIMAN:  Thank you.

Tubbs - Direct (Packard)                                    60

1              THE COURT:  So Exhibit 11 will be received, and you

2    may publish.

3    BY MR. PACKARD:

4    Q.   At some point you understood that Tony Pierce, the

5    recipient of the package, was Anthony Unocic; is that right?

6    A.   That's correct.

7    Q.   You were able to look up things like Exhibit 11 from a

8    criminal history report; is that right?

9    A.   That's correct.

10   Q.   And Exhibit 11 is a conviction out of the District Court

11   for Weld County, Colorado; is that right?

12   A.   That's correct.

13             MR. PACKARD:  Let's focus on, Ms. Sump, Count V, if

14   we could, up at the top.

15   BY MR. PACKARD:

16   Q.   Does Exhibit 11 show that Mr. Unocic entered a plea of

17   guilty to explosive, slash, incendiary parts possession,

18   attempt?

19   A.   Yes.

20   Q.   And that was a felony offense; is that correct?

21   A.   Yes.

22   Q.   Moving down the page to the words "Department of

23   Corrections" kind of halfway down, does Exhibit 11 reflect that

24   Mr. Unocic was sentenced to three years' incarceration?

25   A.   Yes.

Tubbs - Direct (Packard)                                    61

1            MR. PACKARD:  Then let's finally go to the date, if

2    we could, Ms. Sump.

3    BY MR. PACKARD:

4    Q.   And the conviction is dated January 27, 2017; is that

5    right?

6    A.   That's correct.

7    Q.   Did you take steps to investigate the facts that

8    underlie -- that gave rise to this conviction?

9    A.   Yes.

10   Q.   Without telling me what those facts or alleged facts were,

11   did you make -- or contact Colorado and find out about their

12   case?

13   A.   I did.

14   Q.   And did those things that you learned from that case and

15   this investigation impact how you and others went about

16   investigating this case?

17   A.   They did.

18   Q.   And what things did you do differently as a result of what

19   you had learned about with respect to Exhibit 11?

20   A.   Based on what was learned, I personally reached out to

21   some of the ATF experts in explosives to assist with the search

22   warrant execution.  And the primary reason for that was not

23   only the safety, you know, of the defendant or anybody else in

24   the house, but the safety of law enforcement, the safety of the

25   community, et cetera.  So it was primarily for experts to be on

1    hand but also the safety of everyone involved.

2    Q.   All right.  Then when we get -- when we jump ahead to

3    November 2, 2021, there was a search of the house; is that

4    right?

5    A.   Correct.

6    Q.   Had you or others taken steps to protect officers that are

7    searching the house?

8    A.   Yes.

9    Q.   And what steps were taken?

10   A.   So we had the Cheyenne and the ATF explosives experts

11   there, and then we also had conducted an interview with the

12   defendant, and, you know, with all those things in mind, you

13   know, took any sort of precautions that we thought were

14   necessary and had them available immediately on hand in the

15   event that something did come up, either outside of the

16   residence or on the inside.

17   Q.   Did you assist in the search of 709 Cleveland?

18   A.   Yes.

19   Q.   Did you search what was believed to be Mr. Unocic's

20   bedroom?

21   A.   Yes.

22   Q.   There were three roommates.  How did you and others narrow

23   down which was Unocic's bedroom?

24   A.   Specifically, during the search warrant execution, there

25   were just observations that we were all able to make inside the

Tubbs - Direct (Packard)                                        63

1    bedroom of the defendant.  There was paperwork, mail.  We call

2    it indicia of ownership.  So in addition to that there were

3    documents, identification, Social Security cards, all with the

4    defendant's name, and then there were also interviews that were

5    conducted that corroborated that information as well.

6    Q.   Did agents locate a suppressor in Mr. Unocic's room?

7    A.   Yes.

8    Q.   Did you locate firearms in his bedroom?

9    A.   Yes.

10   Q.   What firearms were located?

11   A.   We located a 9-millimeter-caliber pistol in addition to a

12   homemade AR-15 style rifle as well.

13   Q.   Can you describe those two weapons or firearms.

14   A.   Yes.  The pistol was a Makarov Model P-64, again, like I

15   said, 9-millimeter caliber.  It's a pistol.  And the rifle is

16   what I would describe to you all as a standard AR-15, or we may

17   have heard it be called an M4 .223-caliber rifle.

18   Q.   Could you spell Makarov.

19   A.   I believe it's M-A-K- --

20   Q.   I'm not trying to trick you.

21   A.   Yeah.

22   Q.   I'm just --

23   A.   That's fine.

24   Q.   We're making a record of it so....

25   A.   -- -O-R-O-V *[sic]*.  I just want to make sure.  Yeah.

1    Q.   Was there anything unusual about the AR-15?

2    A.   It was a homemade AR-15, so there were no markings on the

3    lower receiver.

4    Q.   Were both firearms loaded?

5    A.   Yes.

6    Q.   How many total rounds of ammunition were found in

7    Mr. Unocic's bedroom?

8    A.   So between the pistol --

9              MR. REIMAN:  I object on relevance, Your Honor.

10             THE COURT:  Okay.  Overruled.  You may proceed.

11   A.   Between the pistol caliber, so the 9-millimeter, and the

12   .223-caliber, there was approximately 650 rounds.

13   BY MR. PACKARD:

14   Q.   Did you find any evidence of the package containing the

15   silencer?

16   A.   Yes.

17   Q.   Tell us about that.

18   A.   So the package that the U.S. postal inspector delivered,

19   we located that same package with the shipping label ripped

20   open and the cardboard box containing the silencer as well, but

21   the USPS package was located hanging on the defendant's door.

22   Q.   Did you find magazines?

23   A.   Yes.

24   Q.   How many?

25   A.   We located multiple .30-caliber magazines compatible for

Tubbs - Direct (Packard)                                                65

1     the .223.  I located multiple pistol-caliber magazines as well,

2     some in excess of 30-round capacity.  We also located a larger

3     drum magazine that was compatible with the .223.  I believe it

4     was a 60-round capacity as well.

5     Q.    Did you find some unfinished receivers?

6     A.    Yes.

7     Q.    How many?

8     A.    Approximately two pistol and two rifle.

9     Q.    And in layman's terms, what are those?

10    A.    You may have heard them be referred to as Polymer80s or

11    P80s, and they're kits that you can assemble and tool and

12    essentially make the receiver or frame function as a pistol,

13    and that was for both the pistol and the rifle.

14    Q.    Did you locate firearm-related tools?

15    A.    Yes.

16    Q.    What are some examples?

17    A.    There was, you know, drill bits, different types of, you

18    know, springs, you know, pins or small type -- screwdriver-type

19    tools that you would commonly, you know, use to work on

20    firearms.

21    Q.    Based on what you observed combined with your training and

22    experience, did it appear that there were materials in the

23    bedroom that were being used in gun -- to -- for assembly of

24    firearms?

25    A.    Yes.

Tubbs - Direct (Packard)                                    66

1    Q.   And the tools that you saw would have assisted in that

2    process; is that correct?

3    A.   Yes.

4            MR. PACKARD:  I'd like to offer and permission -- ask

5    permission to publish Exhibits 17A1 through 17A31, the photos

6    taken during the search warrant.

7            THE COURT:  All right.  Any objection?

8            MR. REIMAN:  I'll object on 403.

9            THE COURT:  All right.

10           MR. REIMAN:  Specifically, especially numbers 30 and

11   31.

12           THE COURT:  All right.  Hold on just a second.

13       And counsel approach for a moment on those two.

14       (At sidebar)

15           THE COURT:  30 and 31.  I don't have it.

16           MR. PACKARD:  This is where they actually took it and

17   screwed it onto the end of the barrel to see if it would fit

18   the gun.

19           MR. REIMAN:  I should have objected to Rule 401 on

20   this, hearsay.

21           THE COURT:  That's the AR-15 that was described?

22           MR. PACKARD:  Right.

23           THE COURT:  That's 29, 30, and 31?  Okay.

24           MR. PACKARD:  This is a closer-up shot.

25           THE COURT:  All right.

1          MR. REIMAN:  I'll object on 403 as well as the

2     redundance, as just one picture could satisfy....

3          THE COURT:  Well, there's two pictures.  There's

4     21 -- which one is that, 29?

5          MR. PACKARD:  30 and 31.

6          THE COURT:  All right.  Let's take a look at 30 and

7     31.

8          MR. PACKARD:  Yeah.  We can get rid of 31.

9          THE COURT:  Okay.  So the objection as to

10    Exhibits 17A30 through 34 is overruled except as to A31 based

11    on 403.  It's overruled as to both 401 and 403.  And Exhibit

12    Number 31, the objection is sustained based on 403.

13       Okay.  All right.  The remainder will be received.

14    They've been offered, they will be received, and I'll allow you

15    to publish.

16       We'll go on the record.

17       (In open court)

18          THE COURT:  The objection as to 403 -- or 401 and 403

19    are overruled except as to Exhibit 17A31.  The objection will

20    be sustained on Rule 403.

21       So Exhibits 17A1 through 30 and A32 through 34 will be

22    received, and you may publish.

23          MR. PACKARD:  Thank you, Judge.  I'd like to start

24    with 17A1.

25    BY MR. PACKARD:

Tubbs - Direct (Packard)                                        68

1    Q.   Agent Tubbs, what are we looking at here in 17A1?

2    A.   That would be the front of 709 Cleveland Avenue, the house

3    with, I guess, the green trees in front and the attached

4    garage.

5    Q.   Was this on November 2, 2021, when investigators were

6    doing surveillance before execution of the search warrant, or

7    was this before November 2?

8    A.   This -- I believe this would have been before

9    November 2nd.

10   Q.   That shows the front of the house; is that right?

11   A.   Yes.

12   Q.   709 Cleveland.  Is that a true and accurate depiction of

13   the residence as it would have appeared on November 2 as well?

14   A.   Yes.

15          MR. PACKARD:  All right.  Let's move to A2, please,

16   Ms. Sump.

17   BY MR. PACKARD:

18   Q.   What are we looking at here in 17A2?

19   A.   It's a black motorcycle.

20   Q.   Again, was this photograph taken during surveillance

21   leading up to November 2?

22   A.   Yes.

23   Q.   Mr. Unocic owned a motorcycle; is that right?

24   A.   Yes.

25   Q.   Is that a Harley-Davidson motorcycle?

Tubbs - Direct (Packard)                                           69

1    A.    I believe so, I believe.

2    Q.    Did you do anything with that motorcycle in your

3    investigation?

4    A.    No.

5    Q.    So it wasn't, like, seized or impounded or taken

6    somewhere; is that right?

7    A.    No.

8    Q.    That was a bad question.  You didn't seize or impound the

9    motorcycle; is that correct?

10   A.    I did not.

11   Q.    Is that a true and accurate depiction of the motorcycle in

12   front of the garage as it would have appeared back in October

13   or November of 2021?

14   A.    I believe it had not moved.  I don't know for certain, but

15   I believe it was still in that same location.

16   Q.    Did you participate in some of the surveillance?

17   A.    Yes.

18         MR. PACKARD:  Let's look at Exhibit 17A3, please.

19   BY MR. PACKARD:

20   Q.    What are we looking at here?

21   A.    This is a photo from the defendant's bedroom in the closet

22   on the floor, which contained a black bag like a duffel-style

23   bag and then some other personal items and totes and clothes,

24   et cetera.

25   Q.    Who was taking the pictures?

Tubbs - Direct (Packard)                                        70

1    A.    At the search warrant execution, it was Jordan Perlstein.

2    He was the individual I mentioned earlier that was in between

3    academies.  He had completed one academy and then was waiting

4    to go to the second academy without the EA.  I'm not for

5    certain on his last name's spelling, but I can definitely get

6    that.  I believe it was P-E-R-L-S-T, I believe, I-E-N, but I

7    think he may have -- he spelled it slightly different than how

8    it sounds.

9    Q.    What was located in the bag depicted in Exhibit 17A3?

10   A.    Those -- the P80 or Polymer80 box contained the pistol or

11   rifle kits that I described earlier, and then there was other

12   firearm accessories in boxes, et cetera, in this bag as well

13   that you can see there.

14   Q.    Were all of the firearm and firearm-related items in this

15   closet in this bag, or were they spread throughout the room?

16   A.    A majority of the items were in the closet or in the bag,

17   but there were other items spread out throughout the room as

18   well.

19            MR. PACKARD:  Let's look at Exhibit 17A4.

20   BY MR. PACKARD:

21   Q.    Is Exhibit 17A4 just another true and accurate depiction

22   of that same bag with the P80 item you've already identified?

23   A.    Yes.

24   Q.    Is there anything else that stands out to you in this

25   picture, as an ATF agent?

1    A.    There's -- like I said, there's another box there with

2    "Magpul," which is a company that makes primarily, you know,

3    magazines.  They also make a lot of other firearms accessories

4    however, though, and then there's different accessories and

5    tools in the bag as well.

6    Q.    Could you please define what a magazine is.

7    A.    Yes.  It is a component or a device, a firearm accessory

8    or part, that would accept the ammunition that you insert into

9    the firearm, and the magazine holds those rounds, and they can

10   contain different calibers and different capacities or

11   different amounts.

12   Q.    And a round is the same as a bullet; right?

13   A.    Yes.

14         MR. PACKARD:  Let's look at Exhibit 17A5.

15   BY MR. PACKARD:

16   Q.    What are we looking at here?

17   A.    This is the black bag with the ammunition, .223-caliber

18   ammunition, and I believe also 9-millimeter caliber ammunition

19   in the gray boxes and the black box as well that says "ammo,"

20   and then in addition to that there's a black and silver and

21   white case to the left of that black bag that is a box for --

22   it's an HDS CO2 shotgun box.

23         MR. PACKARD:  Ms. Sump, could you zoom in on the

24   white box in the middle of the picture.  Maybe even a little

25   more.

 1    BY MR. PACKARD:

 2    Q.    This says "cartridges .223."  Is that right?

 3    A.    Yes.

 4    Q.    And is that another word for ammunition .223 caliber?

 5    A.    Yes.

 6    Q.    Does that ammunition fit the AR-15 that was in the

 7    bedroom?

 8    A.    Yes.

 9          MR. PACKARD:  All right.  Let's zoom out, please, and

10    let's look at that HDS box.  Can you zoom in on the HDS label

11    there, Ms. Sump.

12    Thank you.

13    BY MR. PACKARD:

14    Q.    What is this item here that you can see on the left-hand

15    side of the picture?

16    A.    It's just a box with the HDS company that makes or

17    manufactures this CO2 shotgun.

18    Q.    And based on your experience, what do you do with a CO2

19    shotgun?

20    A.    My understanding is it's similar to -- the best way I can

21    think to describe it is it's similar to a paintball gun in

22    shotgun form, if that makes sense, so it can be -- it can be

23    used as a training tool as well.

24          MR. PACKARD:  Let's look at Exhibit 17A6.

25    BY MR. PACKARD:

Tubbs - Direct (Packard)                                        73

1    Q.    And what do you notice here, or what is depicted here in

2    Exhibit 17A6?

3    A.    Just starting from, I guess, left to right, there's one of

4    the Polymer80 boxes, the white box with the black lettering,

5    and to the right of that, that red kind of square-looking thing

6    would be a jig, they call it, or it's basically what the

7    Polymer80 would sit in while you tool it or work on it.  It's

8    got -- without going into details, it's set up so it can assist

9    you in tooling the Polymer80.

10          And then continuing down from there, there's a plastic

11   package with a magazine inside of it next to the bag, and that

12   would be a 9-millimeter compatible magazine.  I believe this

13   one was a 30- or 33-round magazine.  And then in addition to

14   that, to the right there's buffer tube springs for an AR-15.

15   Those are the spring-looking devices to the right.  And then in

16   addition there's Allen wrenches on top of that gray box.  And

17   then as you continue right, all those PMAG plastic -- the

18   plastic packaging there contains AR-15 compatible magazines.

19   Q.    And are those 30-round magazines?

20   A.    Yes.

21   Q.    And those could be used with the AR-15 you found in the

22   room; is that correct?

23   A.    That's correct.

24   Q.    And the 9-millimeter 30-round magazine could be used with

25   the 9-millimeter handgun found in the bedroom?

Tubbs - Direct (Packard)                                    74

1    A.    I don't believe so.

2    Q.    Why is that?

3    A.    This type of magazine is set up for a polymer or a

4    Glock -- similar Glock frame or receiver, so it could

5    potentially have fit a, you know, finished, functioning, I

6    guess, Polymer80 9-millimeter pistol.

7    Q.    The red rectangular item that you have identified, is that

8    consistent with permitting a owner to make his or her own gun

9    using that item?

10   A.    Yes.

11         MR. PACKARD:  Let's move to Exhibit 17A7.

12   BY MR. PACKARD:

13   Q.    What are we looking at here?

14   A.    This is just another photo of the black bag that contained

15   ammunition.

16         MR. PACKARD:  And let's look at Exhibit 17A8, please.

17   BY MR. PACKARD:

18   Q.    Could you describe what is depicted in Exhibit 17A8.

19   A.    This would be the pistol Polymer80 kit, one of the two

20   that was located.  And again, the same type of red device there

21   that the Polymer80 kit comes in is the jig.

22         MR. PACKARD:  Let's look at Exhibit 17A9.

23   BY MR. PACKARD:

24   Q.    Could you describe what we're looking at here.

25   A.    So starting from the top, those are just drill bits and

Tubbs - Direct (Packard)                                    75

```
 1    different firearm-related tools or accessories and then part of
 2    the homemade AR-15 style rifle that was recovered.
 3              MR. PACKARD:  Let's move to Exhibit 17A10.
 4    BY MR. PACKARD:
 5    Q.   Could you tell us what's depicted there.
 6    A.   This is just a close-up of the Polymer80 pistol to show
 7    that there had been, you know, someone that had tooled or had
 8    worked on this pistol at some point, given the fact of the
 9    markings and shavings that you can see.
10    Q.   Does the photograph depict the way this item actually was
11    found when agents came across it?
12    A.   Yes.
13    Q.   And what does it appear that's going on here?
14    A.   There's rails on the top that need to be tooled is the
15    best way to describe it, or removed, or grinded, if you would,
16    down.  So that appears to be what is being done there.
17    Q.   Does this depict what appears to be a firearm being made?
18    A.   Yes.
19    Q.   And this is one of those ghost gun kits, for lack of a
20    better term; is that fair?
21    A.   Yes.
22              MR. PACKARD:  Let's look at Exhibit 17A11, please.
23    BY MR. PACKARD:
24    Q.   What are we looking at in this picture?
25    A.   So this is a -- it's in a Magpul box, but it is a large-
```

1  capacity, or you may hear them referred to as drum-style

2  magazines.  That was compatible for .223 ammunition.

3  Q.   How about to the left of the mag?  What is that?

4  A.   That appears to be a safety selector lever and maybe some

5  additional parts in there as well, just parts for the AR-15

6  style rifle.

7  Q.   And jumping back to the mag, what's the capacity of that

8  magazine, if you know?

9  A.   I believe it was approximately 60 rounds.

10  Q.   And would that work with the AR-15 that you found in the

11  bedroom?

12  A.   If the firearm, yes, did function properly, it would work.

13          MR. PACKARD:  Let's look at Exhibit 17A12, please.

14  BY MR. PACKARD:

15  Q.   What are we looking at here?

16  A.   This is the homemade AR-15 style rifle that was recovered

17  in the defendant's closet.

18  Q.   Was the curved metal item, the magazine, inserted into the

19  firearm when you came across it?

20  A.   I personally did not observe the insert -- the magazine

21  inserted.  From my recollection, the first agent that noticed

22  it identified it as being inserted into the magazine well.

23  Q.   And were there rounds in the magazine?

24  A.   Yes.

25  Q.   And is that depicted in 17A12?

Tubbs - Direct (Packard)                                      77

1    A.    Yes.

2    Q.    How can you tell?

3    A.    That is, from my recollection, the defendant's bed, and

4    then there's -- there's a window in the magazine, and you can

5    see the brass of the ammunition in that window.

6          MR. PACKARD:  Let's move to Exhibit 17A13, please.

7    BY MR. PACKARD:

8    Q.    What are we looking at here?

9    A.    This is just an overall photo again of the same AR-15 that

10   was located.

11         MR. PACKARD:  Let's look at Exhibit 17A14, please.

12   BY MR. PACKARD:

13   Q.    And what are you noticing here in Exhibit 17A14?

14   A.    This is just a photograph that shows a prescription pill

15   bottle with the defendant's name on it and then some

16   additional, like, tools, personal items, scissors, presumably

17   maybe an inhaler, and then a sharp in, like, a sheath there as

18   well and then some sort of illuminator or flashlight as well.

19   Q.    You said the "sharp."  Is that also the knife with the

20   little ring on the back there?

21   A.    Yes.

22   Q.    And then, the illuminator, is that the cylinder-looking

23   thing?

24   A.    Yes.

25   Q.    What is -- I mean, what is an illuminator?

Tubbs - Direct (Packard)                                    78

1    A.    So I'm not from -- I don't recall at this point exactly

2    what that was, but it could be something that just, you know,

3    produces a light.  There are handheld devices for infrared and

4    stuff like that that would help illuminate a heat signature.  I

5    don't know exactly what this device was, but it appears to me

6    to be something that would assist with showing light.

7    Q.    Do you recall where in the bedroom this stuff was located?

8    A.    I don't specifically.  It was on -- maybe on the floor,

9    but I don't recall exactly.

10          MR. PACKARD:  Let's look at Exhibit 17A15, please.

11    BY MR. PACKARD:

12    Q.    And could you identify what you're seeing here in this

13    exhibit, please.

14    A.    Sure.  So from the left to right, there was additional,

15    like, flashlights and tools and accessories and then, again,

16    additional knives or sharps inside sheaths.  I believe there's

17    approximately three there.  And then car keys, an

18    identification badge for the defendant's dog, and receipts,

19    paperwork, and then identification documents to include the

20    Social Security card.

21    Q.    Are the two knives characterized by that circular ring at

22    the back?

23    A.    Yes.

24    Q.    And you talked about a dog.

25          MR. PACKARD:  Could you zoom in on just that little

Tubbs - Direct (Packard)                                        79

1    dog ID there, Ms. Sump, please.

2    BY MR. PACKARD:

3    Q.    Was there a dog there when you and other officers or

4    agents were at the house?

5    A.    Yes.

6    Q.    What ended up happening with the dog?

7    A.    We -- during the search warrant execution, I believe the

8    dog was in the backyard, and at the conclusion of the search

9    warrant, you know, I did my best to call and calm him down and

10   try to get him some food and water and stuff like that.  I was

11   just trying to be respectful to the animal.  And the fence --

12   we determined the fence was secure and, you know, didn't want

13   it to come inside so we just -- we just made sure the fence was

14   secure and it could stay back there with the assistance of a

15   roommate later to help it get inside.

16   Q.    So when agents leave that day on November 2, the dog's in

17   the backyard?

18   A.    Correct.

19   Q.    It wasn't as though it was seized or taken to the animal

20   shelter or sold or something like that?

21   A.    No.

22   Q.    You talked about finding items of -- indicia of ownership.

23   It looks like there's a --

24          MR. PACKARD:  If we could focus in on the right side

25   of the picture there, Ms. Sump.

1    BY MR. PACKARD:

2    Q.   Is that Mr. Unocic's Social Security card?

3    A.   Yes.

4    Q.   Would that be an example of indicia of ownership that

5    helps you determine what you believe to be Mr. Unocic's room?

6    A.   Yes.

7              MR. PACKARD:  Let's move to Exhibit 17A16, please.

8    BY MR. PACKARD:

9    Q.   What are we looking at here?

10   A.   This is the back of the defendant's bedroom -- excuse me,

11   the back side of the door of the defendant's bedroom, and

12   there's a black plastic bag hanging on the doorknob.

13   Q.   And why is that significant?

14   A.   That is the plastic bag that contained the USPS shipping

15   package that the U.S. postal inspector delivered the suppressor

16   in.

17             MR. PACKARD:  Let's move to Exhibit 17A17.

18   BY MR. PACKARD:

19   Q.   What are we looking at here?

20   A.   And that is the packaging that shows the recipient's name

21   and address, and it contained the suppressor that was delivered

22   by the U.S. postal inspector to the defendant.

23   Q.   And that's the item that was inside that black bag hanging

24   on the bedroom door?

25   A.   Correct.

1    Q.   And that's the packaging -- or the package that was

2    delivered in the controlled delivery that same day of

3    November 2; is that correct?

4    A.   That's correct.

5         MR. PACKARD:  Let's look at Exhibit 17A18, please.

6    BY MR. PACKARD:

7    Q.   What are we looking at here?

8    A.   This is a dresser drawer in the defendant's room that

9    contained the pistol and the TulAmmo 9-millimeter ammunition.

10   Q.   And the pistol was that 9-millimeter Makarov?

11   A.   That's correct.

12   Q.   I don't know if I said that right.

13   A.   (Witness nods head.)

14        MR. PACKARD:  Let's look at Exhibit 17A19.

15   BY MR. PACKARD:

16   Q.   What are we looking at here?

17   A.   It's just a overall from an aerial kind of top looking

18   down at that same drawer.

19   Q.   This appears to be Mr. Unocic's dresser; is that correct?

20   A.   That's correct.

21        MR. PACKARD:  Let's look at Exhibit 17A20.

22   BY MR. PACKARD:

23   Q.   What are we looking at here?

24   A.   This is another drawer that -- in that same dresser that

25   shows the cardboard box of the suppressor that was delivered by

Tubbs - Direct (Packard)                                      82

1    the postal inspector to the defendant.

2    Q.   And is that how that item appeared before being handled or

3    manipulated by any law enforcement officers?

4    A.   Yes.

5             MR. PACKARD:  Let's look at Exhibit 17A21, please.

6    BY MR. PACKARD:

7    Q.   What are we looking at here?

8    A.   That is the same cardboard box, just moved from the

9    dresser to the bed, and then opening the box, just showing that

10   it contained the suppressor that the defendant ordered.

11            MR. PACKARD:  Let's look at Exhibit 17A22.

12   BY MR. PACKARD:

13   Q.   What are we looking at here?

14   A.   This is the -- just a close-up of the magazine to show the

15   ammunition that was loaded in the magazine.

16   Q.   And was that a magazine that was inside that handgun that

17   was in the dresser drawer, or is that something else that we're

18   looking at here in 17A22?

19   A.   No.  This would have been the magazine that was inserted

20   into the homemade AR-15 style rifle that was found.

21   Q.   And can you see the rounds at the top there with the

22   gold-colored round shape?

23   A.   Yes.

24            MR. PACKARD:  Let's look at Exhibit 17A23.

25   BY MR. PACKARD:

Tubbs - Direct (Packard)                                     83

1    Q.   Could you describe what we're looking at here.

2    A.   This is that Makarov pistol with the ammunition removed

3    from the magazine well to show the ammunition that was inserted

4    in the magazine.

5              MR. PACKARD:  Let's look at Exhibit 17A24.

6    BY MR. PACKARD:

7    Q.   What are we looking at here?

8    A.   This is inside the attached garage, and it's a drill

9    press.

10   Q.   And based on your training and experience, how would a

11   drill press be used in connection with home gun kits?

12   A.   It would assist in, you know, tooling the lower receivers

13   for the AR-15.

14   Q.   And again, this item was not in Mr. Unocic's room.  It was

15   in the garage?

16   A.   That's correct.

17             MR. PACKARD:  Let's look at Exhibit 17A25.

18        Could you zoom in on the black box item there in the

19   picture, Ms. Sump.

20   BY MR. PACKARD:

21   Q.   What are we looking at here?

22   A.   This is a box of 12-gauge shotgun ammunition.

23   Q.   And was there actual shotgun ammunition in there?

24   A.   There was.

25   Q.   And did you locate -- you or other officers locate a

Tubbs - Direct (Packard)                                    84

1    shotgun in the house?

2    A.   We did not.

3    Q.   You located the item you described as a paintball or

4    CO2-type shotgun; is that right?

5    A.   From my recollection, we located the box.  I do not recall

6    if there was an actual -- I don't remember if the CO2 shotgun

7    was inside that box.

8    Q.   Was Mr. -- could one access the garage from Mr. Unocic's

9    bedroom?

10   A.   You could, but you would just have -- from my recollection

11   you would have to, you know, go out the front door or the back

12   door of the residence.  So there was a front garage door and

13   then -- that you see here and then a back -- what you would

14   call a pedestrian door to the garage.  So you would have to, I

15   believe, exit the residence on either side to get into the

16   garage.

17   Q.   So this wasn't like three separate units for three

18   roommates.  It was one house, and they all had a bedroom in the

19   same house, and they could all access all the areas in the

20   house.  Is that fair?

21   A.   Yes.

22            MR. PACKARD:  Let's look at Exhibit 17A26.

23   BY MR. PACKARD:

24   Q.   What are we looking at here?

25   A.   That is the black Yukon Denali parked at the VA where the

1    defendant worked.

2              MR. PACKARD:  Could we zoom in on the rear window

3    there, Ms. Sump.

4    BY MR. PACKARD:

5    Q.   There's a sticker that says "U.S. Army Veteran."  Do you

6    know -- well, did you discuss whether Mr. Unocic was a veteran

7    with him?

8    A.   I personally don't recall if I did, but it did come up,

9    you know, during the interview.

10   Q.   Let's -- when was the search of the Yukon in relation to

11   the house?

12   A.   It was before the house.

13   Q.   And this is when you contact him at the VA and you see

14   that his car's there; is that correct?

15   A.   That's correct.

16   Q.   So some agents are out dealing with the car while others

17   are talking to him inside.  Is that kind of how that worked?

18   A.   No.  We actually talked to the defendant first and then,

19   after the conclusion of that, went to the vehicle after.

20   Q.   So I'm doing this backwards the way we're doing this here;

21   right?

22              MR. PACKARD:  Let's look at 17A27.

23   BY MR. PACKARD:

24   Q.   All right.  Can you tell us what we're looking at here.

25   A.   That's the front of the vehicle, and on the center console

1    there, there's a piece of paper on the top where I left a copy

2    of the search warrant return.

3    Q.   And is this a true and accurate depiction of the front

4    passenger and front driver seat of the Yukon as it appeared

5    November 2, 2021?

6    A.   Yes.

7         MR. PACKARD:  Let's look at Exhibit 17A21.  Sorry.

8    28.  Thank you.

9         And zoom in on the bottom there.

10   BY MR. PACKARD:

11   Q.   What are we looking at here?

12   A.   This is just the certification or the signature block to

13   list the date and then the officer or agent that executed the

14   search warrant.  So you write here the date, your name, and

15   then sign it.

16   Q.   Is this a true and accurate depiction of the search

17   warrant return that you left in the car?

18   A.   Yes.

19         MR. PACKARD:  If we could look at the top half of

20   that, Ms. Sump, please.

21   BY MR. PACKARD:

22   Q.   You basically here are saying you didn't seize any

23   property in Mr. Unocic's car; is that right?

24   A.   That's correct.

25         MR. PACKARD:  Let's look at Exhibit 17A29.

1    BY MR. PACKARD:

2    Q.   What are we looking at here?

3    A.   This is the homemade AR-15 with the silencer attached.

4    Q.   And where did you find -- or tell us about the silencer.

5    A.    It's the same silencer that was delivered by U.S. Postal

6    on November 2nd, and the same one that was located in the

7    defendant's bedroom.

8    Q.   And why was the silencer attached to the gun?

9    A.   Just to show that it was -- it could be assembled or would

10   be compatible with that firearm.

11   Q.   Can you give the jury an idea of what a silencer like this

12   will do.  What does it sound like when you shoot a gun like

13   this without it and with it?

14           MR. REIMAN:  I'm going to object on foundation.

15           THE COURT:  Sustained.

16   BY MR. PACKARD:

17   Q.   Have you shot an AR-15 before?

18   A.   Yes.

19   Q.   Have you shot an AR-15 with a silencer like this attached?

20   A.   Not like this, but I have shot a silencer or suppressor

21   attached to an AR-15 before.

22   Q.   Did you do a test-fire of this particular rifle depicted

23   in 17A29?

24   A.   We did without the silencer attached.

25   Q.   Were you around to hear and see that?

1    A.    Yes.

2    Q.    Do you have a silencer in your personal life when you go

3    hunting?

4    A.    I do.

5    Q.    And what is the purpose of that?

6    A.    The purpose would be to muzzle or quiet the sound that it

7    makes, and then it also mitigates some recoil as well.

8    Q.    Are there different sizes of silencers?

9    A.    Yes.

10   Q.    Some silencers come from China; is that right?

11   A.    Yes.

12   Q.    And those are illegal whether you get a license or not; is

13   that correct?

14   A.    It would depend on how that worked.  You need to have

15   proper NFA approval before you possess a silencer.

16   Q.    And what does NFA mean?

17   A.    So it's the National Firearms Act which falls under -- a

18   silencer or suppressor would fall under the NFA, so you need to

19   get approval and paperwork before you can possess that item.

20   Q.    Did you receive training in the Academy, the ATF Academy,

21   about silencers and suppressors?

22   A.    Yeah, we receive some training, yes.

23   Q.    And can you give us an idea of how much of your law

24   enforcement career you've used or been around silencers or

25   suppressors.

Tubbs - Direct (Packard)                                89

1    A.   I would say when -- at my -- in my local law enforcement

2    experience, we were familiar with them because we utilized

3    them.  They were approved for us to be used on the SWAT team,

4    and so they were -- we used them for that reason.

5            THE COURT:  That's enough foundation for this

6    particular issue.

7    BY MR. PACKARD:

8    Q.   Okay.  Could you describe for the jury what this gun --

9    what this firearm depicted in 17A29 would sound like with and

10   without the silencer.

11           MR. REIMAN:  I'm going to object, same -- same

12   objection based upon this suppressor.

13           THE COURT:  Okay.  Overruled.

14   A.   Could you repeat that, please, sir.

15   BY MR. PACKARD:

16   Q.   Could you describe, based on your training and experience,

17   what the sound would be like firing the rifle depicted in

18   Exhibit 17A29 with the silencer attached and without.

19   A.   You know, assuming that everything functions properly and

20   then this specific silencer functions properly, the sound with

21   the silencer attached, to put it in layman's terms, would be

22   quieter than if you were to remove it and, you know, fire the

23   AR-15 without it.  So it would be louder without it attached,

24   quieter with it attached.

25           THE COURT:  All right.  Is this an appropriate time

 1   to break for the afternoon, counsel?

 2           MR. PACKARD:  Yes, Your Honor.

 3           THE COURT:  Okay.  All right.  Very well.  Ladies and

 4   gentlemen of the jury, we are going to break for the day.  It's

 5   4:30 p.m.  I want to instruct you once again that until this

 6   case is completed, until you've heard all of the evidence in

 7   this matter, you're not to discuss this case or the evidence

 8   with anyone, particularly tonight with family members or others

 9   that you may come into contact with.  You're not to discuss it

10   with each other.  You're not to do any research on your own,

11   not to Google any names or equipment or anything that you've

12   heard about today as evidence.  This case should be decided

13   based on the evidence that's adduced in this courtroom and the

14   instructions that you're given.

15       So I want you to get a good rest tonight, and if you'll be

16   back here between 8:35 and 8:40 tomorrow morning, we'll

17   commence the trial right at 8:45 a.m.  All right.  Thank you.

18           (Jury out at 4:33 p.m.)

19           THE COURT:  You may be seated.

20       Agent Tubbs, you may be excused for the day.  We'll have

21   you back tomorrow morning.

22       All right.  Counsel, is there anything that we need to

23   take up before we break for today?

24           MR. PACKARD:  No, Your Honor.

25           MR. REIMAN:  No, sir.

1          THE COURT:  Pardon?

2          MR. REIMAN:  No.

3          THE COURT:  Okay.  All right.  As to the last issue,

4    I think we got -- we didn't need any more foundation to hear

5    that a silencer -- it might be quieter when a silencer is in

6    than when it's not, so it was time to move on to another issue

7    so...all right?

8          MR. REIMAN:  I understand.

9          THE COURT:  So we're through 17A29, and we will

10   commence with the trial tomorrow morning.

11        Again, counsel, if there's anything that we need to take

12   up, let's be here at 8:30.  I want to start the trial right at

13   8:45 for the jury, so if there's anything we need to take up,

14   let me know.  We'll come in the courtroom at 8:30 and take it

15   up.  If not, we will commence trial at 8:45.  Thank you.

16        We are adjourned for the day.

17        (Evening recess at 4:35 p.m.)

18

19                      *  *  *  *  *  *  *  *

20

21        I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23

24

25        */s/Lisa G. Grimminger*                February 6, 2024
          Lisa G. Grimminger, RDR, CRR, CRC    Date

```
 1                              I-N-D-E-X

 2

 3                              Direct   Cross   Redirect

 4

 5    WITNESSES:

 6    FOR THE PLAINTIFF:

 7    Michael Dedinsky              16      35       37

 8    David Tubbs                   40      --       --

 9
                                                        Ruled
10    EXHIBITS:                            Offered      On

11    3. Scotts Bluff County Detention Center (SDCDC)
         J135 Report                         29          29
12
      4. SBCDC Unocic cell transfer log      23          23
13
      6. SBCDC Rivera cell transfer log      25          25
14
      7. SBCDC Hoops cell transfer log       25          25
15
      11. Copy of 2015CR804 from the District
16        Court of Weld County, Colorado, The
          People of the State of Colorado vs.
17        Anthony Pierce Unocic              59          60

18    17A1. Photograph                       66          67

19    17A2. Photograph                       66          67

20    17A3. Photograph                       66          67

21    17A4. Photograph                       66          67

22    17A5. Photograph                       66          67

23    17A6. Photograph                       66          67

24    17A7. Photograph                       66          67

25    17A8. Photograph                       66          67
```

| | | Ruled |
|---|---|---|
| EXHIBITS: (cont'd.) | Offered | On |

| | | |
|---|---|---|
| 17A9. Photograph | 66 | 67 |
| 17A10. Photograph | 66 | 67 |
| 17A11. Photograph | 66 | 67 |
| 17A12. Photograph | 66 | 67 |
| 17A13. Photograph | 66 | 67 |
| 17A14. Photograph | 66 | 67 |
| 17A15. Photograph | 66 | 67 |
| 17A16. Photograph | 66 | 67 |
| 17A17. Photograph | 66 | 67 |
| 17A18. Photograph | 66 | 67 |
| 17A19. Photograph | 66 | 67 |
| 17A20. Photograph | 66 | 67 |
| 17A21. Photograph | 66 | 67 |
| 17A22. Photograph | 66 | 67 |
| 17A23. Photograph | 66 | 67 |
| 17A24. Photograph | 66 | 67 |
| 17A25. Photograph | 66 | 67 |
| 17A26. Photograph | 66 | 67 |
| 17A27. Photograph | 66 | 67 |
| 17A28. Photograph | 66 | 67 |
| 17A29. Photograph | 66 | 67 |
| 17A30. Photograph | 66 | 67 |
| 17A31. Photograph | 66 | 67 |
| 17A32. Photograph | -- | 67 |

|  | Offered | Ruled On |
|---|---|---|
| EXHIBITS: (cont'd.) | | |
| 17A33. Photograph | -- | 67 |
| 17A34. Photograph | -- | 67 |